**Gerardo R. DINSAY, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

**No. 94–149.**

United States Court of Veterans Appeals.

April 16, 1996.

Gerardo R. Dinsay, pro se.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; R. Randall Campbell, Deputy Assistant General Counsel; and Rudrendu Sinhamahapatra, Washington, DC, were on the brief, for appellee.

Before NEBEKER, Chief Judge, and KRAMER and STEINBERG, Judges.

STEINBERG, Judge:

The pro se appellant, World War II veteran Gerardo R. Dinsay, appeals a September 2, 1993, decision by the Board of Veterans' Appeals (BVA or Board) denying an increased rating for residuals of a gunshot wound and of surgery of the right shoulder and arm, currently rated 40% disabling, and implicitly denying service connection for a heart condition asserted to be secondary to those service-connected residuals. Record (R.) at 9, 15. The appellant has filed an informal brief, and the Secretary has filed a brief. For the reasons that follow, the Court will affirm the Board's decision in part, vacate it in part and remand one matter, and dismiss the appeal as to a claim of clear and unmistakable error.

## I. Background

The veteran had recognized guerrilla and Philippine Army service from October 1943 to April 1945, on June 4, 1945, and from January to February 1946. R. at 43, 76. Clinical records and lay statements indicate that he was shot in the right shoulder in October 1942, remained hospitalized for an "unhealed" gunshot wound until March 1945, and was again hospitalized in January and February 1946. R. at 31, 32, 48, 57. A February 1946 station hospital discharge form gives a diagnosis of "[s]inus, right shoulder joint from unhealed [gunshot wound]". R. at 59. His February 1946 Philippine Army discharge form indicates "[g]unshot wound[,] right shoulder" under "[w]ounds received in service". R. at 55–56. A June 1945 medical examination report noted an "unhealed comp[ound] fracture r[ight]

humerus due to G[un] S[hot]". R. at 117. A July 1946 letter from a Philippine Army "provincial surgeon", Lt. Ramos, noted that the veteran suffered from "[a]nkylosis, [s]houlder [j]oint, [r]ight". R. at 30. (Ankylosis is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint", STEDMAN'S MEDICAL DICTIONARY 87 (25th ed. 1990) [hereinafter STEDMAN'S].) In an August 1946 letter to the Veterans' Administration (now Department of Veterans Affairs) (VA), the veteran claimed that he was "unable to land myself a job on account of my disability" and requested a "disability pension". R. at 29. In February 1947, he filed with a VA regional office (RO) an application for VA disability compensation or pension for "[a]nkylosis" of the right shoulder, caused by an unhealed gunshot wound. R. at 23–25. The record does not indicate any development of that claim until 1949. *See* R. at 137–38.

A May 1949 special orthopedic examination report, requested by the VARO, gave a diagnosis of "[r]esiduals of gunshot wound" with the following complications: "Cicatrices, painful, adherent and depressed"; "[m]uscle injury, severe, Group III, with severe atrophy and unfavorable motion of shoulder-joint"; "[n]erve injury, paralysis, partial, moderate, brachial plexus, with moderate anesthesia of upper extremity"; and "[a]nkylosis of shoulder-joint, unfavorable". R. at 66–67. ("Cicatrices" are scars, and "brachial plexus" is the network of nerves, blood vessels, and lymphatic vessels in the arm, STEDMAN'S at 207, 306, 1217.) In a May 1949 decision, the RO denied the claim on the grounds that the veteran's October 1942 injury was not incurred during or aggravated in service. R. at 70. In a May 27, 1949, letter to the veteran, the RO stated: "If you wish to appeal, you should so inform this office, and you will be furnished with VA Form P–9 for that purpose." R. at 69. In a June 1949 letter to the RO, the veteran stated that he wished to "appeal for the reconsideration of my case". R. at 72. The record does not indicate that a VA Form P–9 was ever sent to the veteran in answer to his June 1949 letter. Rather, an August 19, 1949, reply letter from the RO to the veteran, "in reference to your claim for compensation", recited the facts of the veteran's case and concluded that "you are not entitled to benefits for your disabilities not incurred in or aggravated in service. Your claim, therefore, remains in a disallowed status...." Supplemental (Suppl.) R. at 1 (document transmitted to this Court on October 4, 1995, in response to the Court's September 26, 1995, order). An October 1950 RO decision amended the May 1949 decision as to the veteran's periods of active service, but continued the denial of service connection. R. at 82.

The veteran wrote to the RO in January 1971, stating: "I have a claim in your office pertaining to disability compensation whose status is still disallowed." R. at 93. He submitted to the RO additional records pertaining to his World War II service and hospitalization. R. at 93–102. The RO denied his claim that month, noting that, based on all evidence of record, the injury had occurred one year before the veteran's recognized active service began and was not aggravated during active duty. R. at 104. In a February 1971 letter to the RO, the veteran stated: "I am compelled to appeal again [and] this is your third denial". R. at 112.

The veteran testified under oath before the RO in March 1971 that he was continuously hospitalized from 1942 to 1945. He stated:

> [F]rom [the 1942 gunshot wound] until the Americans came to the Philippines I was not cured ... [;] from 1942 I was hospitalized from one place to the other. It was a time that my wound tried to heal but because there was no opportunity to cure it it did not heal completely. We went to the mountains from one place to another[;] that was why my wound was aggravated.

R. at 124–26. In April 1971, the RO, finding the evidence submitted "not new and material to warrant a favorable reconsideration", refused to reopen the claim. R. at 129. He filed a Notice of Disagreement (NOD) the following month. R. at 132. The RO issued a June 1971 Statement of the Case (SOC) which did not indicate that any action had been taken on the veteran's claim between the RO's May 1949 denial and the October 1950 amended denial. R. at 135, 138.

In a January 1972 decision, the Board granted the veteran entitlement to service connection for aggravation of the residuals of a gunshot wound of the upper right extremity. R. at 158, 161. The Board explained that "the evidence submitted in connection with the veteran's reopened claim, specifically, the testimony he offered [in March 1971] during the course of a hearing on appeal, when considered in conjunction with the other evidence of record, affords a new factual basis warranting the grant of service connection". R. at 160. A February 1972 VA medical examination report gave a diagnosis of "[r]esiduals of G[un] S[hot] W[ound] T[hrough and] T[hrough] and surgery ... muscle injury, involving [muscle groups] III, II, and VI; complete ankylosis [of] right shoulder; loss of motion of right shoulder." R. at 164, 167. Based on these findings, a March 1972 RO decision rated the shoulder injury 40% disabling, effective December 1970, to reflect a 50% disability evaluation per the VA medical findings, reduced by 10%, the amount judged to represent the extent of his injury upon entering active service. R. at 171–72.

In April 1972, the veteran filed an NOD, alleging that he suffered "complete ankylosis", which had caused "the loss of use of my right arm .... for which reason I am refused ... employment". R. at 174. He also requested benefits retroactive to his first claim for disability compensation, in 1949, and noted:

> May I disagree with the statements in the Findings and Decision of January 13, 1972. As stated therein, "After due notice on May, 1949, no appeal was pursued by the Veteran." There was an appeal on June 9, 1949[,] which was again denied on August 19, 1949. I was not furnished of [sic] the VA Form P–9, instead was advised per letter of denial on August 19, 1949[,] of the acting USVA Adjudication Officer, Mr. Sims, that my claim was in a disallowed status. These facts were not included in the [SOC] sent to the [BVA]. For your ready reference photostatic copies are enclosed herein from my own compilation.... My appeal therefore, on December 21, 1970[,] was not a reopened one as claimed by the Board.

*Ibid.* In a May 1972 letter in response, the Board Chairman informed the veteran that his June 1949 letter had been answered by an August 1949 RO "disallowance", as to which the veteran "did not file an appeal". R. at 178. In a June 13, 1972, letter, the veteran's wife stated: "Even without the request for forms of Notice of Disagreement the Veteran should have been furnished the necessary forms. Instead the veteran was advised on August 19, 1949[,] that his claim remain[ed] in a disallowed status. The appeal therefore on Dec[ember] 21, 1970, was not a reopened one...." R. at 180.

The RO denied entitlement to an increased rating in decisions dated October 1972, December 1972, September 1973, June 1974, August 1974, June 1976, October 1976, February 1977 (denial of special compensation for loss of use of right hand), November 1977, May 1979, August 1979, June 1981, December 1981, December 1987, and October 1988. R. at 191, 211, 246, 261, 274, 287, 305, 310, 344, 413, 427, 470, 485, 521, 530. The RO also denied retroactive benefits in decisions dated December 1972, October 1976, and February 1978. R. at 211, 305, 363.

In a February 1973 decision, the BVA denied entitlement to an increased rating for gunshot wound residuals and refused to establish an earlier effective date for the award of disability compensation. R. at 221, 225. The Board concluded that "[i]rrespective of the reasons for not filing a timely appeal from the rating determination in May 1949, the fact remains that the determination was not timely appealed". R. at 224. In a March 1973 letter to the BVA, the veteran's wife noted that the veteran had made a "timely appeal of June 9, 1949", and that he "meant a disagreement to the decision of May 27, 1949." R. at 227. In an April 1973 letter, she stated: "My husband and I still strongly believe that the letter of June 9, 1959[, sic] is a timely appeal to that of May 1949." R. at 230.

The veteran brought these claims before the Board on several occasions thereafter. In June 1974, he submitted to the RO a January 1974 letter from Dr. Lopez, who diagnosed "(1) [g]unshot wound[,] (2) [f]rac-

ture of the right shoulder, with paralysis [and] atrophy, thru [sic] scapula[, and] (3)[t]otal loss of function of the right arm", and concluded "that the [veteran was] *100% permanently disabled to do manual work.*" R. at 255, 257 (emphasis in original). An August 1974 VA medical examination report indicated a diagnosis of ankylosis with marked atrophy of and injury to muscles in the shoulder area, but noted that there was "no L[oss] O[f] M[ovement] of the right elbow, right wrist[,] and fingers of the right hand." R. at 268–69. In March 1976, the veteran was hospitalized for angina pectoris, hypertension, and deformity and ankylosis of the right shoulder. R. at 282–83.

In September 1977, the BVA denied the veteran's claims for increased evaluation for his disability; it determined, inter alia, that "[r]esiduals of missile injury and surgery to the right shoulder ... are shown by the evidence to be essentially static", and that "[t]he right hand is more functionally useful than would be the case following amputation with the use of a suitable prosthetic appliance." R. at 327, 330.

An October 1977 VA hospital report showed that the veteran had been hospitalized for four days for vascular hypertension. R. at 341. In an October 1978 decision, the Board denied the veteran entitlement to disability compensation prior to the effective date of December 21, 1970. R. at 392, 396. It noted that "[t]he issue of entitlement to an earlier effective date for the grant of [an] increased rating ... was previously considered by the Board in [February] 1973", and that the issue "remains final in the absence of obvious error or the submission of new evidence which would establish a factual basis not previously considered." R. at 395. The Board acknowledged the veteran's June 1949 letter of appeal, but noted:

> He was informed [in August 1949] that the claim remained disallowed on the basis that the gunshot wound was incurred prior to recognized service. A copy of that letter was also furnished to his accredited representative. The record does not, in fact, show that the veteran was provided with the Form P–9, as he contends. However, this was a clerical oversight and not a

substantive error affecting due process. The fact remains that he was informed of the denial, the reasons therefor, and the time limit for filing an appeal.... He made no further attempt within the proper appellate period to pursue the appeal.... As was stated in the prior Board decision, the denial was reasonably supported by the available evidence at that time.

*Ibid.*

The veteran submitted a May 1979 letter from Dr. Lopez, noting, inter alia, "numbness [and] marked limitation of movement" in the veteran's right arm; "loss of grasping [of] any kind of object"; and "pain radiating to the chest, giving rise to chest oppression [and] anginal pain [and] heaviness." R. at 406–07. A July 1979 VA medical examination report gave a diagnosis of "[r]esiduals of G[un] S[hot] W[ound] (T[hrough and] T[hrough]), r[ight] shoulder [with] healed scars, healed fracture ankylosis, r[ight] shoulder and injury to M[uscle] G[roups] II, III, IV[and] VI". R. at 421. The report also diagnosed, inter alia, "[o]steoarthritis, r[ight] acromioclavicular joint". R. at 417, 422. An August 1979 RO decision and an August 1980 BVA decision again denied his request for an increased evaluation for residuals of gunshot wound and surgery, and denied his request for entitlement to special monthly compensation for the loss of use of his right hand. R. at 427, 452, 457.

In June 1981, the veteran submitted to the RO a June 1981 letter from Dr. Tejuco that noted, inter alia, "[a]nkylosis of the right shoulder joint so that this area is completely immobile", and the "[m]uscles of [his] hand and fingers [were] weakened, probably from diminished use, since shoulder movements are often needed together with their use for most functions." R. at 465. Based on a November 1981 VA medical examination x-ray report, the examining physician noted "no significant change" in the veteran's condition from the July 1979 VA examination. R. at 482. In February 1983, the BVA again denied the veteran's request for entitlement to an increased rating for his shoulder disability. R. at 506, 511. The Board determined his disability to be "static", and noted that the current rating was "the maximum

rating provided for multiple muscle injuries involving the shoulder girdle and arm, less the [10%] level of disability existing prior to entry into service, absent evidence of repeated episodes of osteomyelitis or a showing of such active infection for many years." R. at 510–11.

The veteran again applied for an increased rating in a May 1987 letter, apparently received by the RO in December 1987. R. at 513–14. He submitted a September 1987 certification documenting a seventeen-day hospitalization for "[h]ypertensive cardiovascular disease[, l]eft anterior hemiblock[, and i]ncomplete right bundle branch block". R. at 517. The RO denied his claim in December 1987, concluding in a January 1988 notification that the "evidence [submitted did] not pertain to your service-connected disability". R. at 520–21.

In April 1989, the veteran claimed: "[M]y service-connected gunshot wound should be increased to no less than 80% disabling because it has adversely affected my cardiovascular system" and severely reduced the motion in his arm. R. at 537. He further stated: "[T]he initial disallowance of my claim on May 27, 1949[, wa]s *clearly and unmistakably erroneous*, for the [May 1949 RO] disallowance ... deliberately ignored that service connection may be granted based on incurrence or aggravation, which the [BVA] in 1972 did not discuss in its decision. My letter of June 9, 1949[,] was not even mentioned in the [June 1971 SOC.]" *Ibid.* (emphasis added). In a June 1989 decision, the RO confirmed and continued the veteran's 40% disability rating. R. at 545–46. He filed an NOD in August 1989. R. at 550.

In December 1989, he submitted a contemporaneous statement from a private physician, Dr. Ramos–Neis, which indicated that the veteran had been treated for, inter alia, "[h]ypertension ... cardiac ischemia[,] and severe ankylosis", and asserted that he had "very poor health and [was] unable to earn a living or attend to his normal activities." R. at 557. The RO issued an SOC in February 1990. R. at 560. In his VA Form 1–9 (Substantive Appeal to the BVA) filed in March 1990, the veteran reiterated his claim for an

increased rating and stated that the May 1949 RO decision was "clearly and unmistakably erroneous, because the Acting Adjudication Officer ... *obviously erred* that my disability was *not* AGGRAVATED by my subsequent military service. The [d]octrine of [r]easonable [d]oubt was not considered...." R. at 566 (emphasis in original), 568. In support, the veteran submitted copies of his June 1949 letter and the August 1949 response from the RO. R. at 568.

The veteran testified under oath before the BVA in November 1990 that he was not able to work. R. at 578, 580. In answer to the question whether he could do "something like tying your shoes or fine movements", he stated: "I can sometimes. I feel pain, it will click inside of my right shoulder." R. at 584. He also testified to feeling pain in his shoulder "[s]ome days, not all". *Ibid.* In a January 1991 decision, the BVA found that the issue of an earlier effective date was "not properly before the Board for appellate consideration", and referred the issue "to the [RO] for appropriate action[,] though we recognize that this issue was addressed in a [BVA] decision in October 1978." R. at 596. As to the claim for an increased disability rating, the Board found that "[t]he evidence recently presented fails to disclose impairment which warrants a rating greater than the schedular evaluation assignable for ankylosis of the right upper extremity." R. at 598. November and December 1990 and January 1991 VA medical records indicated that the veteran was evaluated for possible angina (R. at 603), and had an "unconfirmed" abnormal electrocardiogram (R. at 606).

The veteran appealed to this Court, and in October 1992, he filed an informal brief asserting that "[t]he BVA failed to take into account the facts on the issue of retroactive benefits based on aggravation[,] as shown by all evidences already submitted and on file with the originating agency" in May 1949, and in the appellant's June 1949 letter to the RO. Suppl.R. at 1–2. He also claimed that the RO had committed error by "not furnishing me the Form 1–9 [sic] as advised in the VA letter dated May 27, 1949." Suppl.R. at 1. On the Secretary's unopposed motion, the Court, in January 1993, vacated the January

1991 BVA decision and remanded the matter for further adjudication of the veteran's claim that his shoulder disability had adversely affected his cardiovascular system. Suppl.R. at 5, 21. In March 1993, the BVA advised the veteran that he could submit additional "argument". R. at 611.

In the September 2, 1993, BVA decision here on appeal, the Board determined that "the preponderance of the evidence [was] against the claim of an increased rating", and also found that "[n]o objective medical evidence ha[d] been submitted showing that the veteran's service-connected disability of the right shoulder and arm had any effect whatsoever on his cardiovascular system." R. at 11. A timely appeal to this Court followed.

## II. Analysis

### A. Increased Rating for Shoulder Disorder

The veteran seeks an increased rating for his service-connected right-shoulder disability. Service connection for VA disability compensation purposes is awarded to a veteran who served on active duty during a period of war, or during a post–1946 peacetime period, for any disease or injury that was incurred in or aggravated by a veteran's active service. *See* 38 U.S.C. §§ 1110, 1112, 1113(a), 1131; 38 C.F.R. §§ 3.303(a), 3.306 (1995). Disability ratings are to be based, as far as practicable, "upon the average impairments of earning capacity resulting from such injuries in civil occupations". 38 U.S.C. § 1155; *see* 38 C.F.R. § 4.1 (1995). The determination of the level of disability due to ankylosis of the scapulohumeral area is made under 38 C.F.R. § 4.71a (1995), Diagnostic Code (DC) 5200. The criteria for a 50% rating in DC 5200 is as follows:

Unfavorable, abduction limited to 25° from [major] side . . . . . . . . . . . . . . . . . . . . . . . 50

38 C.F.R. § 4.71a, DC 5200. The veteran currently has an award of service connection for residuals of a through-and-through gunshot wound to the right arm and shoulder, rated 40% disabling. The 40% represents the maximum disability rating (50%) allowed under 38 C.F.R. § 4.71a, DC 5200, minus 10% to account for the veteran's preservice injury.

The Court reviews BVA factfinding under a "clearly erroneous" standard; "if there is a 'plausible' basis in the record for the factual determinations of the BVA, . . . [the Court] cannot overturn them". *Gilbert v. Derwinski,* 1 Vet.App. 49, 53 (1990), 38 U.S.C. § 7261(a)(4). A determination whether the veteran's medical condition satisfies DC criteria is a question of fact. *See Lovelace v. Derwinski,* 1 Vet.App. 73, 74 (1990).

Under 38 C.F.R. § 4.55(a) and (b), multiple injuries to the veteran's shoulder and arm may be combined for rating purposes to increase the level of severity of injury, but any such combination may not exceed the maximum entitlement provided for by the schedular criteria. Because the veteran's disability is already rated at the maximum schedular rating of 50%, minus the 10% representing his preservice injury, the veteran may not receive an increased rating for his shoulder and arm disability, absent an award of an extra-schedular rating under 38 C.F.R. § 3.321(b) or 4.16(b) (1995). Thus, the Court cannot find that the Board was clearly erroneous in its denial of an increased rating for the right shoulder and arm.

A veteran is also entitled to special monthly compensation for the loss of use of a hand where "no effective function remains other than that which would be equally well served by an amputation . . . with use of a suitable prosthetic appliance." 38 C.F.R. § 4.63 (1995). The Board determined that the veteran's disability did not satisfy this criterion, finding specifically: "Although the medical evidence reveals some weakening of the muscles of the right hand and fingers, probably from diminished use, there is no evidence of the extreme level of impairment required to meet the aforementioned criteria for 'loss of use' under the regulations." R. at 13. The medical evidence of record indicates, in fact, that the veteran's right hand is not severely disabled. A 1974 VA medical examination report, for example, noted the following: "[N]o L[oss] O[f] M[ovement] of the right elbow, right wrist[,] and fingers of the right hand. Veteran signed his name with the right hand with ease. There is about the same callous formation on the right palm as that of the left." R. at 268. Given

the lack of medical evidence to support a claim for special monthly compensation for loss of use of the right hand, and the medical evidence to the contrary, the Court also cannot find that the Board was clearly erroneous in finding that the criteria of § 4.63 had not been met. *See Lovelace* and *Gilbert,* both *supra.*

### B. Secondary Service Connection for Heart Disorder

■ The veteran asserts that his service-connected condition "adversely affected [his] cardiovascular system". R. at 537. This is an original claim for service connection of a heart disorder as secondary to the veteran's shoulder disorder, and, as such, the claim must be well grounded. *See Jones (Wayne) v. Brown,* 7 Vet.App. 134, 137 (1994). The BVA determined that the claim was well grounded. R. at 11.

Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "[A] plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990).

■ Where the determinative issue involves either medical etiology or a medical diagnosis, competent medical evidence is required to fulfill the well-grounded-claim requirement of section 5107(a). *See Heuer v. Brown,* 7 Vet.App. 379, 384 (1995) (citing *Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993)); *see also Caluza v. Brown,* 7 Vet.App. 498, 506 (1995) (well-grounded claim requires medical diagnosis of current disability, lay or medical evidence of in-service incurrence or aggravation of a disease or injury, and medical evidence of nexus between in-service injury or disease and current disability). A Board determination whether a claim is well grounded is a conclusion of law subject to de novo review by the Court under 38 U.S.C.

§ 7261(a)(1). *See Grivois v. Brown,* 6 Vet. App. 136, 139 (1994); *Grottveit, supra.*

The veteran has a current diagnosis of a heart disorder. R. at 517, 577. As to medical evidence of nexus to service, the May 1979 letter from Dr. Lopez stated:

[The veteran] was examined by the undersigned due to the following chief compl[aint].

(1) Gunshot wound right shoulder thru & thru.

Signs & symptoms:

(1) severe pain [illegible] movement of right arm,

(2) numbness & marked limitation of movement[,] loss of grasping [of] any kind of object

[ (3) ] pain radiating to the chest giving rise to chest oppression & anginal pain & heaviness.

Diagnosis: Deformity severe; shoulder right; with marked displacement; with ankylosis including the humerus & right shoulder.

R. at 406–07. This statement does not unequivocally make a connection between the wound residuals and the pain radiating to the chest, or unequivocally connect the pain radiating to the chest with the veteran's heart disease. However, the statement is ambiguous and the material under "Signs & Symptoms" could be read as making such connections.

In *Grivois v. Brown,* where a physician's statement on nexus to service was ambiguous, the Court vacated the BVA decision and remanded the matter of service connection of a shoulder disorder, noting: "Under these circumstances, we cannot decide the issue of well groundedness, and, assuming this claim to be well grounded, the opinion of the Board is deficient as to the required reasons or bases for the denial." *Grivois,* 6 Vet.App. 136, 140 (1994); *see also* 38 U.S.C. § 7104(d)(1); *Gilbert,* 1 Vet.App. at 57 (Board is required to provide written statement of reasons or bases for its findings and conclusions on all material issues of fact and law presented on record; statement must be adequate to enable appellant to understand

precise basis for Board's decision, as well as to facilitate review in this Court).

Here the Board did not address whether Dr. Lopez's ambiguous statement constituted medical evidence of nexus, and, if so, why that evidence was not persuasive. Thus, as in *Grivois,* the Court will vacate the Board decision as to this issue and remand for readjudication the matter of secondary service connection of a heart disorder which, also as in *Grivois,* "may include a remand to the RO for a clearer medical opinion on causation (including seeking clarification from [the physician who made the ambiguous statement])". *Grivois,* 6 Vet.App. at 140–41.

### C. Appeal as to 1949 RO Decision

■ The appellant argues that the 1949 RO decision never became final because the BVA failed to adjudicate the appeal initiated by his June 1949 letter. *See* 38 U.S.C. §§ 709, 722, Vet. Reg. No. 2(a), part II (1946); 38 C.F.R. §§ 3.330, 19.2 (1949). The Court notes that the January 1991 BVA decision "referred" the issue of an earlier effective date to the RO "for appropriate action", R. at 596, and that the September 2, 1993, BVA decision here on appeal did not adjudicate the claim of procedural error in the 1949 RO decision.

The Court has at times examined the finality of an RO or BVA decision in the process of determining the Court's jurisdiction. In *Tablazon v. Brown,* the Court examined de novo the finality of an RO decision in a case where a subsequent BVA decision on the question of the finality of the RO decision was appealed here. *Tablazon v. Brown,* 8 Vet.App. 359, 361 (1995) ("where VA has failed to procedurally comply with statutorily mandated requirements, a claim does not become final for purposes of appeal to the Court" and hence "there is no final Board decision before us for review"). In *Smith .(George) v. Brown,* the Court held that where the appellant had filed a jurisdiction-conferring NOD and a Notice of Appeal to this Court, the BVA could not subsequently make that NOD a nullity (and thereby vitiate this Court's jurisdiction over an appeal) by granting reconsideration of a prior Board decision triggered by a non-jurisdiction-conferring NOD. *Smith v. Brown,* 8 Vet.App. 546, 552 (1996) (en banc) (Court's jurisdiction cannot generally "turn on the decisions of the Chairman and the BVA").

■ Here, the appellant's argument is that the RO made a procedural error regarding his appeal of the 1949 RO decision. However, because that claim of procedural error was previously adjudicated by the BVA in a final decision in 1972 (not the decision on appeal to this Court, *cf. Tablazon, supra* ), the appellant, in the appeal before this Court, can challenge the finality of the 1949 RO decision only on the basis of clear and unmistakable error (CUE) in that decision. As to the possibility of raising such a challenge based on new and material evidence, *see* 38 U.S.C. §§ 5108, 7104(b), 7105(c), the Court concluded in *Flash v. Brown,* that "claims to reopen and CUE claims are different, mutually exclusive, routes to the goal of determining an effective date". *Flash v. Brown,* 8 Vet.App. 332, 340 (1995); *see* 38 C.F.R. § 3.400 (1995) (effective date of claim to reopen "will be the date of receipt of the claim or the date entitlement arose, whichever is the *later* ") (emphasis added); *cf.* 38 C.F.R. § 3.400(g), (q) (effective date in cases of corrected military records).

Section 3.105(a) of title 38, Code of Federal Regulations, provides:

> Where evidence establishes [CUE], the prior decision will be reversed or amended. For the purpose of authorizing benefits, the rating or other adjudicative decision which constitutes a reversal of a prior decision on the grounds of [CUE] has the same effect as if the corrected decision had been made on the date of the reversed decision.

38 C.F.R. § 3.105(a) (1995). A claim of CUE is a collateral attack on a final decision of an agency of original jurisdiction, generally an RO. *See Smith (William) v. Brown,* 35 F.3d 1516, 1521 (Fed.Cir.1994); *Duran v. Brown,* 7 Vet.App. 216, 223 (1994); *Talbert v. Brown,* 7 Vet.App. 352, 355 (1995). To mount a successful CUE claim, it must be shown that "the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant at the time were incorrectly applied" and that

the error committed by the RO was such that "had it not been made, would have manifestly changed the outcome at the time it was made." *Russell v. Principi*, 3 Vet.App. 310, 313 (1992) (en banc).

In its 1978 final decision, the Board determined, in essence, that there had been no CUE in the 1949 RO decision either as to the issue of service connection by aggravation or on the effective-date issue in terms of the finality of the 1949 RO decision. (The Board found no "obvious error" in that the RO's 1949 "denial was reasonably supported by the available evidence at that time", R. at 395; the concepts of CUE and obvious error are equivalent, *see Russell*, 3 Vet.App. at 314.) The September 2, 1993, BVA decision here on appeal did not adjudicate a CUE claim. The 1978 BVA decision having already adjudicated those claims of CUE, the Court is without jurisdiction to review them again in connection with the appellant's raising the issue of an earlier effective date. *See Russell*, 3 Vet.App. at 315 ("Once there is a final decision on the issue of [CUE] ... that particular claim of [CUE] may not be raised again"). Therefore, the veteran's CUE claims will be dismissed.

The Court notes that if relevant evidence as to a procedural defect or other error in the 1949 RO decision was actually or constructively (*see Bell v. Derwinski*, 2 Vet.App. 611, 612–13 (1992) (per curiam order)) present within the VA system, although not before the adjudicator, at the time of the RO decision, that evidence could possibly serve as the basis for a new CUE claim (not a "reopened" CUE claim, *see Flash, supra*) that "the correct facts, as they were known at the time, were not before the adjudicator". *Russell*, 3 Vet.App. at 313; *see also Olson v. Brown*, 5 Vet.App. 430, 433–34 (1993) (Court reversed 1990 BVA decision that had found no CUE in 1982 final decision, notwithstanding previous BVA denial of CUE in that final decision as to different issue); *cf. Russell*, 3 Vet.App. at 315 ("*same* issue" may not be raised again as CUE once there has been a final BVA decision "not to revise or amend") (emphasis added).

## III. Conclusion

Upon consideration of the record, the appellant's informal brief, and the Secretary's brief, the Court vacates the September 2, 1993, decision of the BVA as to the secondary service-connection claim and remands that matter for readjudication consistent with this opinion, dismisses the claims of CUE in the 1949 RO decision, and in other respects affirms the BVA decision (including as to the increased-rating claim).

VACATED AND REMANDED IN PART; DISMISSED IN PART; AFFIRMED IN PART.