Citation Nr: 1714113 
Decision Date: 04/28/17 Archive Date: 05/05/17

DOCKET NO. 09-30 895 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO)
in St. Louis, Missouri


THE ISSUES

1. Entitlement to service connection for a right knee/leg disability, to include whether new and material evidence has been received.

2. Entitlement to service connection for a left shoulder/arm disability, to include whether new and material evidence has been received.

3. Entitlement to an increased rating in excess of 10 percent for postoperative bilateral heel spurs. 

4. Entitlement to an extension of a temporary total rating based on the need for convalescence (38 C.F.R. § 4.30) following a July 2, 2010 surgery on the service-connected left knee, beyond September 1, 2010.

5. Entitlement to an increased rating for a service-connected left knee disability prior to January 6, 2015: currently rated as 10 percent disabling prior to July 2, 2010 and from September 1, 2010 to June 15, 2013, with separate ratings from June 15, 2013 to January 6, 2015 including a 10 percent rating for service-connected left knee degenerative changes with painful extension, a 20 percent rating for service-connected left knee instability, and a 20 percent rating for service-connected left knee painful flexion.

6. Entitlement to an increased rating in excess of 30 percent for service-connected left total knee replacement (TKR), during the period from March 1, 2016.

7. Entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU).


REPRESENTATION

Appellant represented by: Missouri Veterans Commission


ATTORNEY FOR THE BOARD

C. L. Wasser, Counsel

INTRODUCTION

The Veteran served on active duty from August 1974 to August 1994.

This case has a lengthy procedural history and comes to the Board of Veterans' Appeals (Board) on appeal from rating decisions dated in November 2008, September 2012, March 2014, and June 2014.

The Board previously remanded this appeal to the Agency of Original Jurisdiction (AOJ) for additional development in May 2011, May 2012, March 2013, September 2013, and October 2015.

In its November 2008 rating decision, the RO denied an increase in a 10 percent rating for a service-connected left knee disability, which, at that time, was characterized as residuals of a left knee injury, post-operative, with degenerative changes. The Veteran appealed for an increased rating. During the pendency of the appeal, as discussed below, the AOJ has assigned staged and separate ratings for the left knee disability, including a temporary 100 percent rating during the periods from July 2, 2010 to September 1, 2010, and from January 6, 2015 to March 1, 2016.

In a June 2014 rating decision, the AOJ granted a temporary total rating for convalescence for left knee surgery from July 2, 2010 to September 1, 2010, under 38 C.F.R. § 4.30, and the Veteran has appealed for an extension of this period.

In rating decisions dated in June 2013, June 2014, and July 2016, the AOJ has recharacterized the service-connected left knee disability and granted separate ratings for it, with a 10 percent rating for painful extension of the left knee from September 1, 2010 to January 6, 2015, a 20 percent rating for left knee instability from June 15, 2013 to January 6, 2015, and a 20 percent rating for painful left knee flexion, from June 15, 2013 to January 6, 2015. Since these increases did not constitute a full grant of the benefits sought, the increased rating issue remains in appellate status. AB v. Brown, 6 Vet. App. 35, 39 (1993). Thus, although the Veteran has appealed for earlier effective dates for the separate ratings for left knee instability and painful flexion, the proper rating for the service-connected left knee disability (however characterized) throughout the entire rating period was already on appeal, and thus the increased rating issues are listed as such on the first page of this decision.

In a July 2015 rating decision, the AOJ recharacterized the left knee disability as left total knee replacement (TKR), and assigned a 100 percent schedular rating effective from January 6, 2015 (the date of a left TKR) to March 1, 2016, with a 30 percent rating from March 1, 2016.

This case also comes to the Board on appeal from a September 2012 rating decision that denied an increase in a 10 percent rating for service-connected bilateral heel spurs, postoperative.

This case also comes to the Board on appeal from a March 2014 rating decision that in pertinent part, determined that new and material evidence had not been submitted to reopen previously denied claims for service connection for a right knee/leg disability and a left shoulder/arm disability. 

When a Veteran submits evidence of unemployability in association with a claim for an increased rating, a claim for TDIU benefits is inferred. Rice v. Shinseki, 22 Vet. App. 447 (2009). In light of the Veteran's reports during VA examinations that he lost his job and was unemployed due to his bilateral knee disability, the Board finds that a claim for a TDIU has been raised, since his left knee disability is service-connected and he has appealed for an increased rating. However, additional development is needed as to this issue.

Additional evidence was received from the Veteran in February 2015. As the Veteran has waived initial RO review of this evidence, the Board will consider it. 38 C.F.R. § 20.1304.

The Board notes that the Veteran has filed a notice of disagreement at the RO concerning the effective date of the award of a 20 percent rating for left knee flexion that was assigned in a July 2016 rating decision, as shown in the electronic claims file (VBMS). Such appeal is contained in the VACOLS appeals tracking system as an active appeal at the RO. As noted above, the proper rating for the service-connected left knee disability is already in appellate status before the Board.

The issues of entitlement to service connection for a right knee/leg disability and a left shoulder/arm disability, entitlement to an increased rating for a left TKR during the period from March 1, 2016, and entitlement to a TDIU are addressed in the REMAND portion of the decision below and REMANDED to the AOJ.


FINDINGS OF FACT

1. The RO previously denied the Veteran's claims of service connection for a right knee/leg disability, and a left shoulder/arm disability in a March 2008 rating decision and properly notified the Veteran, who did not perfect an appeal of that decision.

2. Some of the additional evidence received since the March 2008 RO decision is not cumulative or redundant of evidence already of record and considered in that decision and raises a reasonable possibility of substantiating the claims for service connection for a right knee/leg disability, and a left shoulder/arm disability.

3. Symptoms of the Veteran's service-connected postoperative bilateral heel spurs with plantar fasciitis have most nearly approximated subjective complaints of pain, with impaired locomotion including difficulty with prolonged standing and walking, which result in overall moderately severe impairment.

4. The Veteran underwent left knee arthroscopy and partial medial meniscectomy on July 2, 2010, and was awarded a temporary total 100 percent rating from that date until September 1, 2010.

5. Throughout the period prior to July 2, 2010, the Veteran's service-connected left knee disability was manifested by a meniscal tear, degenerative joint disease, locking, constant pain, and effusion; range of motion was no worse than 0 to 90 degrees, there was no recurrent subluxation or lateral instability, and no ankylosis.

6. The preponderance of the competent medical evidence is against a finding that the Veteran required convalescence following his July 2010 left knee surgery beyond September 1, 2010.

7. During the rating period from September 1, 2010 to August 22, 2011, the Veteran's service-connected left knee disability was manifested by a partial meniscectomy, degenerative joint disease, pain, clicking and locking; range of motion was no worse than 0 to 87 degrees, there was no recurrent subluxation or lateral instability, and no ankylosis.

8. From August 22, 2011 to June 15, 2013, the left knee disability was manifested by slight instability, degenerative joint disease with painful flexion and extension no worse than 10 to 95 degrees with no ankylosis.

9. From June 15, 2013 to January 6, 2015, the left knee disability was manifested by frequent locking, painful flexion and extension of the left knee no worse than 0 to 65 degrees, with no motion after repetitive motion testing, weakened movement, excess fatigability, incoordination, impaired ability to execute skilled movements smoothly, moderate instability, and no ankylosis.


CONCLUSIONS OF LAW

1. The March 2008 rating decision that denied service connection for right knee/leg disability, and a left shoulder/arm disability is final. 38 U.S.C.A. § 7105 (c) (West 2014); 38 C.F.R. §§ 3.104 (a), 20.1103 (2016). 

2. New and material evidence having been received, the claims for service connection for right knee/leg disability, and a left shoulder/arm disability is reopened. 38 U.S.C.A. § 5108 (West 2014); 38 C.F.R. § 3.156 (a) (2016).

3. Resolving reasonable doubt in the Veteran's favor, the criteria for a 20 percent disability rating, but no higher, for service-connected postoperative bilateral heel spurs with plantar fasciitis, are met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.1-4.14, 4.31, 4.40. 4.45, 4.71a, Diagnostic Code (DC) 5284 (2016).

4. During the period prior to July 2, 2010, resolving reasonable doubt in the Veteran's favor, the criteria for an increased 20 percent disability rating, but no higher, for the service-connected left knee disability are met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.1-4.14, 4.31, 4.40. 4.45, 4.71a, Diagnostic Codes (DCs) 5010, 5257, 5258, 5260, 5261 (2016).

5. The criteria for a temporary total rating beyond September 1, 2010, for convalescence following left knee surgery are not met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.30 (2016).

6. During the rating period from September 1, 2010 to August 22, 2011, resolving reasonable doubt in the Veteran's favor, the criteria for an increased 20 percent disability rating, but no higher, for the service-connected left knee disability are met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.1-4.14, 4.31, 4.40. 4.45, 4.71a, Diagnostic Codes (DCs) 5010, 5257, 5258, 5260, 5261 (2016).

7. During the rating period from August 22, 2011 to June 15, 2013, resolving reasonable doubt in his favor, the criteria for three separate 10 percent ratings for slight instability, painful flexion, and painful extension of the left knee are met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.1-4.14, 4.31, 4.40. 4.45, 4.71a, Diagnostic Codes (DCs) 5010, 5257, 5260, 5261 (2016).

8. During the period from June 15, 2013 to January 6, 2015, the criteria for a rating in excess of 20 percent for instability of the left knee are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.1-4.14, 4.31, 4.40. 4.45, 4.71a, Diagnostic Code (DC) 5257 (2016).

9. During the period from June 15, 2013 to January 6, 2015, the criteria for a higher 30 percent rating for painful flexion of the left knee are met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.1-4.14, 4.31, 4.40. 4.45, 4.71a, Diagnostic Codes (DC) 5010-5260 (2016).

10. During the period from June 15, 2013 to January 6, 2015, the criteria for a rating in excess of 10 percent for painful extension of the left knee are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.1-4.14, 4.31, 4.40. 4.45, 4.71a, Diagnostic Codes (DC) 5010-5261 (2016).



REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Notice and Assistance

VA has duties to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a).

With regard to the applications to reopen previously denied claims of service connection for disabilities of the left shoulder/arm and the right knee/leg, the Board finds that the AOJ has substantially satisfied the duties to notify and assist. To the extent that there may be any deficiency of notice or assistance, there is no prejudice to the appellant in proceeding with these issues given the fully favorable nature of the Board's decision as to whether new and material evidence has been submitted.

As to the increased rating issues, VA's duty to notify was satisfied by letters dated in September 2008, May December 2011, July 2012, January 2014, and April 2014. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2016); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). Additional notice was sent in letters dated in March 2009, May 2011, May 2012, and April 2013, and the claims were most recently readjudicated in a July 2016 supplemental statement of the case.

VA also fulfilled its duty to assist the Veteran with these claims by obtaining all potentially relevant evidence, which is obtainable, and therefore appellate review may proceed without prejudicing him. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159; see also Bernard v. Brown, 4 Vet. App. 384 (1993). To this end, VA has obtained service treatment records, service personnel records, and post-service VA and private medical records, and arranged for VA compensation examinations and medical opinions as to the severity of his left knee and bilateral foot disabilities in March 2010, June 2011, July 2012, June 2013, and January 2016. 

It appears that some of the Veteran's service treatment records are missing. In a January 2008 memorandum, the AOJ issued a formal finding that additional service treatment records were unavailable. The AOJ has since made repeated attempts to obtain additional service treatment records. After an October 2015 Board remand, the AOJ obtained the Veteran's service personnel records and some additional service treatment records, and in a November 2015 memorandum, the National Personnel Records Center (NPRC) indicated that all available service treatment records and service personnel records had been sent for scanning into the Veteran's electronic VBMS claims file.

In this decision, the Board is adjudicating the issue of an increased rating for the left knee disability prior to January 6, 2015 (the date of a left TKA), while the issue of entitlement to an increased rating for the left knee disability after March 1, 2016 is being remanded for additional development. 

With respect to the claims for increased ratings, only if the record is inadequate or there is suggestion the current rating may be incorrect is there then a need for a more contemporaneous examination. 38 C.F.R. § 3.327(a). Here, the most recent VA compensation examination for the left knee disability was conducted in June 2013, and the most recent VA examination of the feet was conducted in January 2016. The mere passage of time since does not, in and of itself, necessitate another examination. See Palczewski v. Nicholson, 21 Vet. App. 174 (2007). A medical opinion is adequate when it is based upon consideration of the appellant's prior medical history and examinations and also describes the disability in sufficient detail so that the Board's "evaluation of the claimed disability will be a fully informed one." Barr v. Nicholson, 21 Vet. App. 303, 311 (2007). 

The Board finds that the June 2013 and January 2016 VA examination reports were sufficiently detailed with recorded history, impact on employment and daily life, and clinical findings. The examinations were conducted by competent medical professionals. In addition, it is not shown that the examinations were in any way incorrectly conducted or that the VA examiners failed to address the clinical significance of the Veteran's symptoms. Further, the VA examination reports addressed the applicable rating criteria. In this regard, the reports of record contain sufficiently specific clinical findings and informed discussion of the pertinent history and features of the service-connected left knee disability and bilateral foot disability to provide probative medical evidence for rating purposes. 

Recently, during the pendency of the appeal, the United States Court of Appeals for Veterans Claims (Court) held in Correia v. McDonald, 28 Vet. App. 158, 169-70 (2016) that to be adequate, examination reports must include joint testing for pain on both active and passive motion, in weight-bearing and non-weight-bearing and, if possible, with range of motion measurements of the opposite undamaged joint. The June 2013 VA left knee examination included joint testing in active motion, in weight-bearing and non-weightbearing, discussed the effects of pain and flare-ups on the left knee, and included range of motion testing of the opposite knee. The claims file also contains private medical records of treatment and evaluation of the left knee disability during the appeal period. Remand for a retrospective medical opinion regarding the severity of the left knee disability prior to the January 2015 left TKA would merely delay the already lengthy appeal, while providing no benefit to the Veteran. Similarly, the service-connected postoperative bilateral heel spurs have been recently evaluated in January 2016, and the examiner evaluated the bilateral foot disability in active motion, in weight-bearing and non-weightbearing, and discussed the effects of pain and flare-ups. 

Based on the foregoing, the Board finds that, in the circumstances of this case, any additional development as to these issues would serve no useful purpose. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991) (strict adherence to requirements in the law does not dictate an unquestioning, blind adherence in the face of overwhelming evidence in support of the result in a particular case; such adherence would result in unnecessarily imposing additional burdens on VA with no benefit flowing to the claimant); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (remands which would only result in unnecessarily imposing additional burdens on VA with no benefit flowing to the claimant are to be avoided).
 
The Board finds that the most recent VA examinations are adequate as they provide the information needed to properly rate these disabilities. 38 C.F.R. §§ 3.327(a), 4.2. The Board finds that another examination is not needed since there is sufficient evidence, already on file, to fairly decide these claims. 

The Board further finds that the RO has substantially complied with its prior remand orders. In this regard, the Board directed that VA examinations of the left knee and feet be conducted, that the issue of a convalescent rating be adjudicated, and additional service treatment records, service personnel records, and post-service treatment records be obtained, and this was done. Therefore, the Board finds that no further development is necessary in this regard. See D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (remand not required under Stegall v. West, 11 Vet. App. 268 (1998), where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (2002).

VA has substantially complied with the notice and assistance requirements and the appellant is not prejudiced by a decision on the claims at this time.

New and Material Evidence

In its March 2014 decision, the RO determined that new and material evidence had not been received to reopen the previously denied claim for service connection for a right knee/leg disability and a left shoulder/arm disability. Regardless of how the RO ruled on this question, the Board must determine whether there is new and material evidence to reopen these claims, before proceeding further, because this initial determination affects the Board's jurisdiction to adjudicate these claims on their underlying merits. Jackson v. Principi, 265 F.3d 1366 (Fed. Cir. 2001); Barnett v. Brown, 83 F.3d 1380 (Fed. Cir. 1996). 

A decision of the RO becomes final and is not subject to revision on the same factual basis unless a notice of disagreement is filed within one year of the notice of the decision, and a timely substantive appeal is received after issuance of a statement of the case. 38 U.S.C.A. § 7105 (West 2014); 38 C.F.R. §§ 20.200, 20.302, 20.1103 (2016). If a claim of entitlement to service connection has been previously denied and that decision became final, the claim can be reopened and reconsidered only if new and material evidence is presented with respect to that claim. 38 U.S.C.A. § 5108 (West 2014); see also Manio v. Derwinski, 1 Vet. App. 140, 145 (1991). 

New evidence is defined as existing evidence not previously submitted to agency decisionmakers. Material evidence is defined as existing evidence that, by itself or when considered with previous evidence of record, relates to an unestablished fact necessary to substantiate the claim. New and material evidence can be neither cumulative nor redundant of the evidence of record at the time of the last prior final denial of the claim sought to be reopened, and must raise a reasonable possibility of substantiating the claim. 38 C.F.R. § 3.156 (a) (2016). 

In determining whether evidence is "new and material," the credibility of the new evidence must be presumed. Justus v. Principi, 3 Vet. App. 510, 513 (1992); Kutscherousky v. West, 12 Vet. App. 369, 371 (1999) (per curium). See also Duran v. Brown, 7 Vet. App. 216 (1994) ("Justus does not require the Secretary to consider the patently incredible to be credible"). The United States Court of Appeals for Veterans Claims (Court) has interpreted the language of 38 C.F.R. § 3.156 (a) as creating a low threshold and viewed the phrase "raises a reasonable possibility of substantiating the claim" as "enabling rather than precluding reopening." Shade v. Shinseki, 24 Vet. App. 110 (2010). 

In a March 2008 rating decision, the RO denied the Veteran's original claim for service connection for a right knee/leg disability, and a left shoulder/arm disability. The Veteran was notified of this decision by a letter dated in April 2008. A notice of disagreement was received from him in April 2008, and a statement of the case was issued in July 2009. A timely substantive appeal was not received from him as to these issues, and no additional evidence pertinent to the issues was physically or constructively associated with the claims folder within one year of notice of the rating decision. See 38 C.F.R. § 3.156 (2016); Bond v. Shinseki, 659 F.3d 1362 (Fed. Cir. 2011); see also Buie v. Shinseki, 24 Vet. App. 242, 251-52 (2010). Thus, the March 2008 rating decision became final as to these issues based on the evidence then of record. 38 U.S.C.A. § 7105 (West 2014); 38 C.F.R. §§ 3.104 (a), 3.160(d), 20.200, 20.302, 20.1103 (2016).

The evidence of record at the time of the prior final March 2008 decision included some of his service treatment records, post-service private medical records and records from an Army hospital showing diagnoses of a right knee disability and a left shoulder disability, a report of a December 1994 VA examination, and the Veteran's claim. 

In the March 2008 decision, the RO noted that the Veteran's service treatment records were incomplete, and that attempts to obtain additional service treatment records had been unsuccessful. The RO issued a formal finding in January 2008 as to the unavailable service treatment records.

Additional evidence received since the prior final March 2008 rating decision includes private medical records showing diagnoses and treatment of right knee and left shoulder disabilities, VA medical records and examination reports, service personnel records, additional service treatment records, and lay statements by the Veteran.

With regard to the additional service personnel and treatment records that were associated with the claims file since the prior March 2008 decision, the Board notes that 38 C.F.R. § 3.156 (c) provides that, at any time after VA issues a decision on a claim, if VA receives or associates with the claims file relevant official service department records that existed and had not been associated with the claims file when VA first decided the claim, VA will reconsider the claim, notwithstanding paragraph (a) of the same section (which defines new and material evidence). Here, however, these partially duplicative service treatment records and service personnel records are not relevant to the instant claims as the additional records do not address any in-service complaints or findings with regard to the claimed disabilities. Accordingly, reconsideration of the Veteran's claim under 38 C.F.R. § 3.156 (c) is not warranted based upon these additional, partially duplicative, service treatment and personnel records.

Upon review of the record, the Board finds that some of the evidence received since the March 2008 RO decision is new and material. Specifically, the additional evidence includes competent lay statements by the Veteran to the effect that he had continuous right knee and left shoulder symptoms since service, and the comment by the March 2010 VA examiner which suggested that the Veteran's bilateral degenerative knee changes may be related to his reported parachute use. When considered with the evidence of record, this evidence triggers VA's duty to assist by providing a medical opinion, which might raise a reasonable possibility of substantiating the claims. Thus, the claims are reopened. See Shade, supra; 38 U.S.C.A. § 5108; 38 C.F.R. § 3.156(a).

Increased Ratings

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Rating Schedule) and are intended to represent the average impairment of earning capacity resulting from disability. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities. Disabilities must be reviewed in relation to their history. 38 C.F.R. § 4.1. Other applicable, general policy considerations are: interpreting reports of examination in light of the whole recorded history, reconciling the various reports into a consistent picture so that the current rating may accurately reflect the elements of disability, 38 C.F.R. § 4.2; resolving any reasonable doubt regarding the degree of disability in favor of the claimant, 38 C.F.R. § 4.3; where there is a question as to which of two evaluations apply, assigning a higher of the two where the disability picture more nearly approximates the criteria for the next higher rating, 38 C.F.R. § 4.7; and, evaluating functional impairment on the basis of lack of usefulness, and the effects of the disability upon the person's ordinary activity, 38 C.F.R. § 4.10.

Governing law provides that the evaluation of the same manifestation under different diagnoses, known as pyramiding, is to be avoided. See Esteban v. Brown, 6 Vet. App. 259 (1994); see also 38 C.F.R. § 4.14. In Esteban, the United States Court of Appeals for Veterans Claims (Court) found that when a Veteran has separate and distinct manifestations from the same injury he should be compensated under different Diagnostic Codes.

When it is not possible to separate the effects of the service-connected disability from a non-service-connected disability, such signs and symptoms must be attributed to the service-connected disability. 38 C.F.R. § 3.102; Mittleider v. West, 11 Vet. App. 181, 182 (1998) (per curiam).

When rating the Veteran's service-connected disability, the entire medical history must be borne in mind. Schafrath v. Derwinski, 1 Vet. App. (1991). In general, the degree of impairment resulting from a disability is a factual determination and the Board's primary focus in such cases is upon the current severity of the disability. Francisco v. Brown, 7 Vet. App. 55, 57-58 (1994); Solomon v. Brown, 6 Vet. App. 396, 402 (1994). However, staged ratings are appropriate in any initial rating/increased-rating claim in which distinct time periods with different ratable symptoms can be identified. Fenderson v. West, 12 Vet. App. 119, 126-127 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007).

The Veteran's lay statements are considered competent evidence when describing his symptoms of disease or disability that are non-medical in nature. Barr v. Nicholson, 21 Vet. App. 303 (2007), Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009); Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006); and Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). His lay statements and testimony regarding the severity of his symptoms must be viewed in conjunction with the objective medical evidence of record and the pertinent rating criteria. And the ultimate probative value of his lay statements is determined not just by his competency, but also his credibility to the extent his statements and testimony concerning this is consistent with this other evidence. See Layno v. Brown, 6 Vet. App. 465, 469 (1994) (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted")). See also 38 C.F.R. § 3.159(a)(1) and (a)(2).

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence or deformity of structures or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by the visible behavior in undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. § 4.40. However, in Mitchell v. Shinseki, 25 Vet. App. 32 (2011), the Court held that, although pain may cause a functional loss, pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system. Rather, pain may result in functional loss, but only if it limits the ability to perform the normal working movements of the body with normal excursion, strength, speed, coordination, or endurance. Id., quoting 38 C.F.R. § 4.40.

With respect to joints, in particular, the factors of disability reside in reductions of normal excursion of movements in different planes. Inquiry will be directed to more or less than normal movement, weakened movement, excess fatigability, incoordination, pain on movement, swelling, deformity or atrophy of disuse. 38 C.F.R. § 4.45. In determining the degree of limitation of motion, the provisions of 38 C.F.R. §§ 4.10, 4.40, and 4.45 are for consideration. See DeLuca v. Brown, 8 Vet. App. 202 (1995).

The assignment of a particular Diagnostic Code is "completely dependent on the facts of a particular case." Butts v. Brown, 5 Vet. App. 532, 538 (1993). One Diagnostic Code may be more appropriate than another based on such factors as an individual's relevant medical history, diagnosis, and demonstrated symptomatology. Any change in Diagnostic Code must be specifically explained. See Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992). The Board accordingly will consider whether another rating code is more appropriate than the one used by the RO. See Tedeschi v. Brown, 7 Vet. App. 411, 414 (1995).

Increased Rating for Bilateral Heel Spurs, Postoperative

In a December 1994 rating decision, service connection was established for history of bilateral heel spurs, postoperative, rated 10 percent disabling under Diagnostic Code 5284. The Veteran's service-connected postoperative bilateral heel spurs disability has been rated as 10 percent disabling under this Code throughout the rating period on appeal.

The Veteran filed a claim for an increased rating for postoperative bilateral heel spurs in August 2011. 

Diagnostic Code 5284 provides rating criteria for other foot injuries. A moderate foot injury warrants a 10 percent disability evaluation. A moderately severe foot injury warrants a 20 percent disability evaluation and a severe foot injury is assigned a 30 percent disability evaluation. A 40 percent disability evaluation will be assigned for actual loss of use of the foot. 38 C.F.R. § 4.71a, DC 5284.

VA's General Counsel has determined that DC 5284 is a general diagnostic code under which a variety of foot injuries may be rated; that some injuries to the foot, such as fractures and dislocations for example, may limit motion in the subtalar, midtarsal, and metatarsophalangeal joints; and that other injuries may not affect range of motion. Thus, General Counsel concluded that, depending on the nature of the foot injury, DC 5284 may involve limitation of motion. VAOPGCPREC 9-98.

The words "moderate," "moderately severe," and "severe" as used in the various Diagnostic Codes are not defined in the VA Schedule for Rating Disabilities. Rather than applying a mechanical formula, the Board must evaluate all of the evidence, to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6. The use of terminology such as "severe" by VA examiners and others, although an element of evidence to be considered by the Board, is not dispositive of an issue. All evidence must be evaluated in arriving at a decision regarding an increased rating. 38 C.F.R. §§ 4.2, 4.6.

With respect to the service-connected postoperative bilateral heel spurs, the Board finds that DC 5284 is for application because this disability resulted from a foot injury and is not specifically contemplated under another diagnostic code. See Yancy v. McDonald, 27 Vet. App. 484, 492-93 (2016) (holding that application of DC 5284 is limited to disabilities resulting from actual injuries to the foot, but that unlisted conditions may be rated by analogy to injury of the foot under DC 5284); 38 C.F.R. § 4.20 (providing that unlisted conditions may be rated by analogy under a closely related disease or injury). "The plain meaning of the word 'injury' limits the application of DC 5284 to disabilities resulting from actual injuries to the foot, as opposed to disabilities caused by, for example, degenerative conditions." Yancy, 27 Vet. App. at 491. 

Initially, the Board notes that the medical evidence demonstrates that the Veteran has a non-service-connected bilateral foot disability of pes planus (flat foot), and symptoms from this disability may not be considered when evaluating the service-connected postoperative bilateral heel spurs. 38 C.F.R. § 4.14.

On VA examination in December 1994, the examiner noted that the Veteran had short half-inch scars on the medial surface of each heel, where he had surgery for bone spurs. An X-ray study of the feet showed no fracture, dislocation or bony destruction. There was a small calcaneal bone spur on the left.

On VA examination of the feet in July 2012, the examiner diagnosed bone spurs. On examination of the feet, scars were seen, but none of the scars were painful or unstable, and the total area of all related scars was not greater than 39 square cm (6 square inches). The Veteran reported that he regularly used shoe inserts. The examiner stated that due to the Veteran's foot condition, there was not functional impairment of an extremity such that no effective function remains other than that which would be equally well served by an amputation with prosthesis. An X-ray study of the feet showed bilateral foot flattening, which the examiner opined was not due to bone spurs. The Veteran reported that he had been unemployed for 15 months, and lost his job as school bus driver because he was unable to put pressure on the soles of his feet. He reported that he could only walk about 200 yards before his feet began hurting and he had to take his shoes off. He reported that he used a whirlpool for his feet daily to help with pain and swelling. He was unable to stand in one position for over 15 minutes due to the pain. He wore shoe inserts daily. The Veteran reported that his doctors told him that they could do surgery again, but the spurs would grow right back. 

On VA examination in January 2016, the examiner noted that the Veteran was previously diagnosed with calcaneal spurs of both feet and underwent surgical resection of same in 1991 during service. He reported that his symptoms recurred in 1994. The examiner also diagnosed plantar fasciitis, and opined that this diagnosis was associated with the claimed condition. The Veteran reported that he had heel pain that began after walking about 1/4 of a mile for exercise, and it averaged about a 6. He said the pain was not present if he was not very active. He also related that he changed shoes and that helped a little. He previously wore inserts but no longer did; he stated that the feet remained symptomatic. With regard to flat foot symptoms, the Veteran reported that he had pain on use of both feet, which was accentuated on use. He did not have pain on manipulation of the feet or characteristic callouses, and did not have swelling on use. On examination, he had decreased longitudinal arch (flat foot) of both feet on weight-bearing. There was objective evidence of marked deformity of both feet, namely pronation, and this was improved with orthopedic shoes or appliances. The weight-bearing line did not fall over or medial to the great toe, there was no lower extremity deformity other than pes planus, causing alteration of the weight-bearing line, the Veteran did not have "inward" bowing of the Achilles tendon of either foot, and did not have marked inward displacement and severe spasm of the Achilles tendon (rigid hindfoot) on manipulation of one or both feet. He had pain at the origin of plantar fascia bilaterally; the right was more painful than the left. Pain was noted on weight-bearing and contributed to functional loss. The examiner indicated that there was pain, weakness, fatigability, or incoordination that significantly limited functional ability during flare-ups or when the foot was used repeatedly over a period of time, specifically a loss of ability to walk due to increased pain. The examiner stated that there was no other functional loss during flare-ups or when the foot is used repeatedly over a period of time, and no other pertinent physical findings, complications, conditions, signs or symptoms related to the service-connected condition. The examiner noted that the Veteran had surgical scars, but they were not painful or unstable, and did not have a total area equal to or greater than 39 square cm (6 square inches). The examiner stated that due to the Veteran's foot condition, there was not functional impairment of an extremity such that no effective function remains other than that which would be equally well served by an amputation with prosthesis. X-ray studies were performed and did not show arthritis. The examiner stated that the X-rays were virtually unchanged from 2012 until today in regards to any spurring on heels. The examiner stated that the functional impact of the condition was an inability to walk distances over one quarter of a mile. He had been employed as a school bus driver but had to quit due to knee problems.

In light of the January 2016 VA examiner's medical opinion that the Veteran's bilateral plantar fasciitis is associated with his service-connected postoperative bilateral heel spurs, the Board will recharacterize the service-connected disability to include this diagnosis.

Based on the above evidence, including VA examinations and treatment records, as well as the Veteran's own description of bilateral foot pain with resulting limitation in functioning, the Board finds that a 20 percent rating, indicative of "moderately severe" disability under DC 5284, is warranted throughout the rating period on appeal. The Board further notes that the Veteran's reports of pain, weakness, fatigability, and functional impairment are specifically encompassed in the Board's assignment of the 20 percent disability rating. As described above, DC 5284 provides for ratings based on the overall severity of the disability. Overall, the Board finds that the Veteran's left foot symptomatology more nearly approximates that of a moderately severe disability. In reaching this conclusion, the Board finds probative the fact that the Veteran experiences foot pain aggravated by ambulation, which impacts his ability to stand or walk for prolonged periods. Thus, the Board finds that the Veteran's disability picture more nearly approximates a 20 percent disability rating for the entire rating period under DC 5284. See 38 C.F.R. § 4.7.

The Board finds that a rating greater than 20 percent is not warranted because during the pendency of the appeal, the Veteran's postoperative bilateral heel spurs with plantar fasciitis has not required medical intervention aside from orthotic inserts, which he is not currently using, and has not been found to result in severe functional impairment by the either of the VA examiners. Moreover, the evidence fails to suggest that the Veteran's disability is analogous to actual loss of use of the foot, as it is clear that the Veteran's feet are functional. See 38 C.F.R. § 4.71a, DC 5284.

The weight of the evidence is also against a finding of a higher rating under any other Diagnostic Code. As noted, symptoms of the Veteran's non-service-connected bilateral pes planus (flat foot) may not be considered when evaluating the service-connected foot disability and thus DC 5276 is inapplicable, and the Veteran does not have weak foot or claw foot, so evaluation under Diagnostic Codes 5277-5278 is not warranted. In addition, the record contains no evidence of any malunion or nonunion of the feet secondary to the Veteran's service-connected disabilities, so evaluation under DC 5283 is not warranted.

In light of the lay and medical evidence of record, the Board finds that the Veteran is entitled to the assignment of a 20 percent disability rating for bilateral heel spurs with plantar fasciitis, and no higher, throughout the rating period on appeal.

The Board has also considered whether referral for one or more "extraschedular" ratings is warranted. An extraschedular rating is a rating outside of the regular rating criteria and is permitted if certain factors are present.

The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Thun v. Peake, 22 Vet. App. 111 (2008). Therefore, initially, there must be a comparison between the level of severity and symptomatology of the Veteran's service-connected disability with the established criteria found in the rating schedule for that disability. If the criteria reasonably describe the Veteran's disability level and symptomatology, then his disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. Id. at 115.

Here, the schedular rating criteria used to rate his service-connected disabilities above reasonably describes and assesses his disability level and symptomatology. The criteria rate his bilateral heel spurs with plantar fasciitis on the basis of severity of symptoms including pain, weakness, and loss of function. Thus, the demonstrated manifestations - namely pain, and inability to stand and walk for long periods of time- are contemplated by the provisions of the rating schedule, the DeLuca factors, and the provisions of 38 C.F.R. § 4.40, 4.45, 4.59.

With respect to the first prong of Thun, the evidence in this case does not show such an exceptional disability picture that the available schedular evaluations for are inadequate. A comparison between the level of severity and symptomatology of the Veteran's bilateral foot disability with the established criteria shows that the rating criteria reasonably describe the Veteran's disability levels and symptomatology. As a general matter, the terms moderate, moderately severe, and severe are broad enough to encompass all of the symptoms of the disability rated under DC 5284. Specifically, as described above, the Veteran's foot disability is manifested as pain, which increased with ambulation, resulting in difficulty with prolonged walking or standing; these symptoms are contemplated in the assigned schedular rating under DC 5284. As such, the Board finds that the Veteran's schedular rating is adequate to compensate him for his bilateral foot disability, and referral for extraschedular consideration is not warranted.

In Johnson v. McDonald, 762 F.3d 1362, 1365-66 (Fed. Cir. 2014), the United States Court of Appeals for the Federal Circuit (Federal Circuit) held that "[t]he plain language of § 3.321(b)(1) provides for referral for extraschedular consideration based on the collective impact of multiple disabilities." Here, however, the issue has not been argued by the Veteran or reasonably raised by the evidence of record. The Veteran has not asserted, and the evidence of record does not suggest, any such combined effect or collective impact of multiple service-connected disabilities that create such an exceptional circumstance to render the schedular rating criteria inadequate. Yancy v. McDonald, 27 Vet. App. 484, 495 (Fed. Cir. 2016) ("the Board is required to address whether referral for extraschedular consideration is warranted for a veteran's disabilities on a collective basis only when that issue is argued by the claimant or reasonably raised by the record through evidence of the collective impact of the claimant's service-connected disabilities"). The Board will therefore not address the issue further.

Increased Rating for the Left Knee Disability 

In a December 1994 rating decision, service connection was established for residuals of left knee injury, postoperative with degenerative changes.

The Veteran filed a claim for an increased rating for the service-connected left knee disability in April 2008. He contends that his left knee disability is more disabling than currently evaluated.

As noted above, the Veteran underwent a left total knee replacement (TKR) on January 6, 2015, and was assigned a 100 percent rating for this disability until March 1, 2016. In the instant decision, the Board is adjudicating only that part of the appeal period prior to January 6, 2015.

Prior to July 2, 2010 (the date of left knee arthroscopy and partial medial meniscectomy), the RO rated the Veteran's service-connected left knee disability as 10 percent disabling, under Diagnostic Code 5010-5257. Hyphenated diagnostic codes are used when a rating under one code requires use of an additional diagnostic code to identify the basis for the evaluation assigned. 38 C.F.R. § 4.27.

Diagnostic Code 5010 concerns arthritis due to trauma; it requires establishment by X-ray evidence. Diagnostic Code 5010 is to be rated the same as DC 5003. Under DC 5003, degenerative or traumatic arthritis established by x-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joint or joints involved. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. However, in the absence of limitation of motion, the disability is to be rated as 10 percent disabling with x-ray evidence of involvement of two or more major joints or two or more minor joint groups; and as 20 percent disabling with x-ray evidence of involvement of two or more major joints or two or more minor joint groups, with occasional incapacitating exacerbations. Disability ratings under DC 5003 is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added. Multiple involvements of the interphalangeal, metacarpal and carpal joints of the upper extremities are considered groups of minor joints. 38 C.F.R. § 4.45.

The normal range of motion of the knee is from 0 degrees extension to 140 degrees flexion. 38 C.F.R. § 4.71, Plate II.

Under Diagnostic Code 5260, pertaining to limitation of leg flexion, a noncompensable evaluation is assigned where flexion is limited to 60 degrees. A 10 percent rating is warranted where flexion is limited to 45 degrees. A 20 percent evaluation is for application where flexion is limited to 30 degrees. Finally, a 30 percent rating applies where flexion is limited to 15 degrees. 38 C.F.R. § 4.71a, Diagnostic Code 5260.

Under Diagnostic Code 5261, pertaining to limitation of leg extension, a noncompensable evaluation is assigned where extension is limited to 5 degrees. A 10 percent rating is warranted where extension is limited to 10 degrees. A 20 percent evaluation is for application where extension is limited to 15 degrees. A 30 percent rating applies where extension is limited to 20 degrees. A 40 percent rating is warranted where extension is limited to 30 degrees. Finally, a 50 percent evaluation is warranted where extension is limited to 45 degrees. 38 C.F.R. § 4.71a, Diagnostic Code 5261.

Knee impairment with recurrent subluxation or lateral instability is rated 10 percent when slight, 20 percent when moderate, and 30 percent when severe. 38 C.F.R. § 4.71a, Diagnostic Code 5257. 

Symptomatic removal of the semilunar cartilage is assigned a maximum 10 percent rating under 38 C.F.R. § 4.71a, Diagnostic Code 5259. Disabilities involving cartilage, semilunar, dislocated, with frequent episodes of locking, pain, and effusion into the joint are assigned a maximum 20 percent rating. 38 C.F.R. § 4.71a, Diagnostic Code 5258.

VA's General Counsel has held that a claimant who has arthritis and instability of the knee may be rated separately under Diagnostic Codes 5003 and 5257, respectively. VAOPGCPREC 23-97; 62 Fed. Reg. 63,604 (July 1, 1997; revised July 24, 1997). The General Counsel subsequently clarified in VAOPGCPREC 9-98 (August 14, 1998) that for a knee disability rated under Diagnostic Code 5257 to warrant a separate rating for arthritis based on X-ray findings and limitation of motion, limitation of motion under Diagnostic Code 5260 or Diagnostic Code 5261 need not be compensable but must at least meet the criteria for a zero-percent rating. VA's General Counsel further explained that, if a Veteran has a disability rating under Diagnostic Code 5257 for instability of the knee, a separate rating for arthritis could also be based on X-ray findings and painful motion under 38 C.F.R. § 4.59. This is because, read together, Diagnostic Code 5003 and 38 C.F.R. § 4.59 provide that painful motion due to degenerative arthritis, which is established by X-ray, is deemed to be limitation of motion and warrants the minimum rating for a joint, even if there is no actual limitation of motion. See Lichtenfels v. Derwinski, 1 Vet. App. 484, 488 (1991).

VA's General Counsel has additionally held that separate ratings may also be assigned for limitation of knee extension and flexion. VAOPGCPREC 9-2004; 69 Fed. Reg. 59, 990 (2004). Specifically, where a Veteran has both a compensable level of limitation of flexion and a compensable level of limitation of extension of the same knee, the limitations must be rated separately to adequately compensate him for functional loss associated with injury to his leg and knee. Id. 

Medical records from Leonard Wood Army Community Hospital dated in 2008 reflect treatment for left knee pain.

A March 2008 magnetic resonance imaging (MRI) of the left knee showed that the Veteran complained of left knee pain and limitation of motion, and said his symptoms had progressively worsened. Within the medial compartment, there was a tear of both the posterior horn and the body of the medial meniscus. There was medial compartment chondrosis with some minimal subchondral edema/cyst formation. Osteophyte formation was noted. Within the lateral compartment, the lateral meniscus was intact without tear. Chondrosis and cartilage attenuation with subchondral edema/cyst formation were most evident along the posterior lateral femoral condyle. Osteophyte formation was noted. Within the patellofemoral compartment, the patellar cartilage was relatively congruent. There was chondrosis and subchondral bone marrow edema lateral trochlea. A physiologic amount of fluid was seen within the left knee joint. Both the anterior and posterior cruciate ligaments were intact as was the extensor mechanism. The medial collateral ligament was intact as was the lateral collateral ligament complex and posterolateral corner. The diagnostic impression was left knee osteoarthrosis, with extensive chondrosis and cartilage attenuation posterior lateral femoral condyle with subchondral edema/cyst formation, a suspected tear of the posterior horn and body of the medial meniscus. There was a horizontal/meniscal flap tear posterior horn with inner margin radial tear involving the body. 

On VA examination in March 2010, the Veteran complained of left knee pain. He reported progressively worsening symptoms, including giving way, pain, stiffness, weakness, decreased speed of joint motion, swelling and tenderness. He denied instability and episodes of dislocation or subluxation. He reported locking episodes daily or more often, and repeated effusions. He reported severe flare-ups, that occurred weekly and lasted one to two days. He stated that squatting, and prolonged standing and walking precipitated his symptoms, and rest alleviated them. He said that when he had pain, it stopped most activities. He stated that he could stand for 15-30 minutes, and could not walk more than a few yards. He used a brace and walker intermittently but frequently. On examination, there was no crepitation, no instability, no clicks or snaps, no grinding, and no patellar or meniscus abnormality. Range of motion of the left knee was from 0 to 95 degrees; extension was normal. There was no objective evidence of pain with active motion of the left knee. There was no objective evidence of pain following repetitive motion, and no additional limitations after three repetitions of range of motion. There was no ankylosis. The examiner stated that at this time he was asymptomatic. There was minimal effusion, but no popliteal bursal enlargement. Testing of the MCL and LCL was normal. Grind and Lachman tests were normal. Drawer testing was normal. There was no patellar facet tenderness or increased tracking error. An X-ray study showed bony hypertrophic arthritic changes at the knee joints with narrowing of the medial joint compartment and marginal osteophyte formation. Tiny osteophytes at the patella were also identified. There was no significant suprapatellar joint effusion, and no definite acute fracture, dislocation or bony destruction. The diagnostic impression was degenerative changes at the knee joints with narrowing of medial joint compartments and marginal osteophyte formation. The clinical diagnosis was degenerative joint disease of the bilateral knees. The examiner opined that the disability was manifested by left knee pain and had significant effects on the Veteran's occupation, including decreased mobility, problems with lifting and carrying, lack of stamina, weakness or fatigue, decreased strength, and pain. The examiner noted that the Veteran's usual occupation was laborer and DOT driver, and he was currently employed as a DOT driver part-time and held this job for 10 to 20 years. He was assigned different duties, and had increased absenteeism. He could not pass the DOT physical for driving due to hypertension and diabetes mellitus, and lost the laborer job due to knee problems, and an inability to squat and bend. The bilateral knee disabilities had severe effects on chores and exercise, moderate effects on recreation, traveling and driving, and mild effects on shopping, bathing and dressing. Sports were prevented. 

Private medical records from C.D.M., D.O. dated from 2010 to 2013 reflect treatment for bilateral knee disabilities. A report of a June 2010 examination of the left knee by Dr. M. reflects that the Veteran complained of bilateral knee pain, and said he could walk for approximately a half mile but if he did so he had a lot of pain for the next few days. The diagnoses were degenerative joint disease and meniscal tears of both knees. On examination, there was full extension of the bilateral knees, and flexion was to 90 degrees bilaterally. There was moderate tricompartmental crepitus pronounced mostly at the patellofemoral compartments. Ligaments were stable of each knee. There was no effusion present. The calf was soft and non-tender. The X-rays were reviewed and revealed tri-compartmental Grade 3 degenerative osteoarthritis. There was approximately 50 percent loss of joint space medial and lateral symmetrical. The diagnostic impression was current tear of the meniscus of knee. Dr. M. recommended arthroscopy of each knee to debride the medial menisci and perform chondroplasty as indicated.

In a July 2010 note, Dr. M. stated that the Veteran had surgery on July 2, 2010, and a second surgery planned on July 20, 2010, and he recommended absence from work until August 16, 2010. A July 30, 2010 private medical record from Dr. M. reflects that the left knee was examined, and the Veteran was two weeks status post left knee arthroscopy and partial medial meniscectomy and doing well. On examination, the portal holes looked good. There were no signs of infection and no calf tenderness. Homan's was negative. He had full range of motion and there was no significant effusion. The diagnostic impression was status post arthroscopic knee surgery. Dr. M. stated that the Veteran needed to continue to work on range of motion, and avoid squatting, deep knee bending and pivoting on the left knee. 

Private medical records from St. John's hospital reflect that the Veteran underwent right knee surgery on August 5, 2010, including arthroscopy and partial medial meniscectomy.

A November 2010 private medical record from Dr. M. reflects that an examination revealed the Veteran had full extension of the bilateral knees. He was able to flex just to 90 degrees of each knee. There was moderate tricompartmental crepitus pronounced mostly at the patellofemoral compartments. Ligaments were stable of each knee. There was no effusion present. The calf was soft and non-tender. The X-rays were reviewed and revealed tri-compartmental Grade 3 degenerative osteoarthritis. There was approximately 50 percent loss of joint space medial and lateral symmetrical. The diagnosis was status post arthroscopic knee surgery and meniscal tear bilateral knees. He had a partial medial meniscectomy, and needed to continue to work on range of motion. He needed to avoid squatting, deep knee bending and pivoting on the left knee. 

A January 2011 private medical record from Dr. M. reflects that he was planning a right knee arthroscopy. On examination the Veteran had full extension of both knees. He was able to flex just to 90 degrees of each knee. There was moderate tricompartmental crepitus pronounced mostly at the patellofemoral compartments. Ligaments were stable in each knee, and there was no effusion present. The calf was soft and non-tender. An X-ray study showed tri-compartmental Grade 3 degenerative osteoarthritis. There was approximately 50 percent loss of joint space medial and lateral symmetrical. The diagnostic impression was status post arthroscopic knee surgery, meniscal tear bilateral knees.

A June 2011 private medical record from Dr. M. reflects that the Veteran reported pain in the knees since the arthroscopies he had the previous year. He had clicking of both knees, and the knees gave out and locked. The right had gotten worse. The pain woke him at night. He took hydrocodone for the pain. He had swelling if he walked a lot. He avoided stairs due to the pain, but when he took stairs, descending was worse. The pain was reportedly the same as what he had at the time of his arthroscopies. Dr. M. noted that the Veteran had a left knee scope on July 2, 2010, and a right knee scope on August 5, 2010. An examination of the left knee revealed positive patello-femoral crepitus. There was full extension, and the endpoint caused pain. Flexion was to 120 degrees. There was minimal joint line tenderness. On examination of the right knee, there was full extension, and flexion was to 100 degrees. There was medial joint line tenderness, and tenderness of the medial femoral condyle. The diagnosis was osteoarthritis, knee. He recommended strengthening the quadriceps and Euflexxa injections. In July 2011, the Veteran had small bilateral effusion of the knees, with full extension and 118 degrees flexion bilaterally. He was given injections in the knees. 

On VA examination in June 2011, the Veteran reported that he started noticing the left knee pain after parachuting and having to run. It also occurred while doing helicopter dismounts. He had had it gradually worsening over the years. He used bracing with exercise, and had used a walker when needed. It was recommended that he use aqua therapy. In August 2010 he had a meniscectomy with debridement, and since that time he had intermittent pain. It was now recommended that he start a regimen of hyaluronic acid injections. This remains a post-operative knee which was not at maximal medical improvement (MMI) and had continued symptoms requiring Hyaluronic Acid injections. On examination, gait was antalgic with poor propulsion. He used a cane. Left knee joint findings included effusion and tenderness. There was anteromedial joint line tenderness with minimal effusion. There was no instability, no patellar abnormality. There was meniscus abnormality. There was no locking or dislocation. The meniscus was surgically absent, and McMurray's test was negative.

Range of motion of the left knee was from 0 to 87 degrees. Extension was normal. There was objective evidence of pain with active motion. Range of motion of the right knee was from 0 to 115 degrees. There was objective evidence of pain following repetitive motion, with no additional limitations after three repetitions of range of motion. There was no ankylosis. The examiner stated that the knee was still in the recovery phase from the meniscectomy and debridement. The quadriceps muscle was still weak since the surgery. The examiner stated that the Veteran was not employed because his left knee precluded getting a DOT physical. The diagnosis was degenerative joint disease of the left knee, status post medial meniscectomy and debridement. The examiner opined that the Veteran's left knee disability had significant effects on his occupation, with left knee pain, decreased mobility, problems with lifting and carrying, weakness or fatigue, decreased strength. The examiner stated that the left knee disability reportedly caused him to fail his DOT examination and lose his job. Due to a left medial meniscectomy and debridement there was a scar of the left lower extremity. There were three peripatellar portal surgical scars. There was no skin breakdown over the scars and he reported no pain. The maximum width was .1 cm, and the maximum length was 1 cm. The scar was not painful. The diagnosis was arthroscopic portal scars.

A report of an August 22, 2011 private examination of the left knee by Dr. M. reflects that the Veteran complained of disuse atrophy of the left and right quadriceps and instability. It was noted that the Veteran was seen after receiving injections, but had not noticed much improvement. It was noted that he had been very active. On examination, the Veteran had significant patellofemoral crepitus, and crepitus in the medial joint line, with no instability and no effusion. He had medial osteoarthritis of the left knee demonstrated on X-ray study. There was Grade III, nearly stage IV degeneration of the patellofemoral compartment, subchondral cysts, subchondral sclerosis, periarticular osteophytes, joint subluxation, and joint space narrowing. The X-ray study showed that both the right and left knees were varus. The clinical diagnostic impression was degenerative joint disease and osteoarthritis of the bilateral knees. Dr. M. recommended an unloading knee brace bilaterally.

A February 2012 private medical record from Mercy Hospital reflects that the Veteran was given bilateral medial unloading knee braces. On examination, he had a marked antalgic gait with bilateral lateral lean on weightbearing. Active range of motion was as follows: flexion to 120 degrees and extension to 0 degrees bilaterally.

On VA examination on July 23, 2012, the Veteran reported that he was unable to stand for more than a few minutes, and unable to walk more than a few yards. He used a cane. On examination, he had an antalgic gait. The left knee had limitation of motion and crepitation. There was no quadriceps atrophy, and mild crepitation with knee motion. There was a meniscus abnormality, with no locking, effusion or dislocation, and the meniscus was surgically absent. McMurray's test was negative. Left knee active range of motion was extension to 10 degrees and flexion to 95 degrees, and passive range of motion was extension to 5 degrees and flexion to 105 degrees. Right knee active range of motion was extension to 0 degrees and flexion to 95 degrees, and passive range of motion was extension to 10 degrees and flexion to 110 degrees. The examiner stated that there was objective evidence of pain following repetitive motion but no additional limitations after three repetitions of range of motion. There was no ankylosis. There was a mild varus deformity bilaterally. An X-ray study showed moderate medial joint space narrowing, mild to moderate patellofemoral degenerative changes. The Veteran reported that he was unemployed because his left knee caused him to fail a DOT physical. The diagnosis was degenerative joint disease of the left knee, status post medial meniscectomy and debridement. The problem associated with the diagnosis was left knee pain with significant effects on occupational activities, with decreased mobility, problems with lifting and carrying, weakness or fatigue, decreased strength in the lower extremity. The examiner noted that the right knee also had degenerative changes. The VA examiner stated that the claims file and medical records were reviewed, and that the Veteran had no knee ankylosis, no recurrent subluxation or lateral instability no semilunar cartilage dislocation, no limitation of flexion to 30 degrees or less, no limitation of extension to 15 degrees or more, and no nonunion or malunion of the tibia or fibula.

On VA left knee examination on June 15, 2013, the examiner diagnosed degenerative arthritis and left meniscal tear with surgical repair, residual scarring and instability. The Veteran reported that flare-ups impacted the function of the knee and/or lower leg. He said his flare-up symptoms were more pain, swelling, and locking up, and sometimes his knees gave out 25 times a year. He said flare-ups lasted 2-3 days, and he had to sit down, stretch his legs out, ice, elevate, use and muscle rubs, and took Motrin and Oxycodone. On examination, flexion of the left knee was to 65 degrees, with objective evidence of painful motion at 30 degrees. Extension of the left knee was to 0 degrees with objective evidence of painful motion at 0 degrees. Flexion of the right knee was to 75 degrees, with objective evidence of painful motion at 30 degrees, and extension was to 0 degrees with no objective evidence of painful motion. After repetitive use testing with 3 repetitions, left knee post-test range of motion was to 60 degrees of flexion and 0 degrees of extension. The examiner noted that the left knee locked up on the third repetition and he broke out in a sweat. After repetitive use testing with 3 repetitions, right knee post-test range of motion was to 65 degrees of flexion and 0 degrees of extension. 

The examiner stated that the Veteran had additional limitation in range of motion of the knee and lower leg following repetitive-use testing, and functional loss and/or functional impairment, namely less movement in both knees, weakened movement in the left knee, excess fatigability in both knees, incoordination, impaired ability to execute skilled movements smoothly in both knees. There was pain on motion, swelling, instability of station, disturbance of locomotion, and interference with sitting, standing and weight-bearing in both knees. Pain, weakness, fatigability, and incoordination could significantly limit functional ability during flare-ups, or when the joint was used repeatedly over a period of time. With regard to additional limitation, the examiner indicated that sometimes one or even both knees locked up with no motion, and he had to roll around on the floor to get from one place to another until he got assistance. He had pain to palpation of the joint line or soft tissues of both knees. Muscle strength was 5/5 in the right knee and 4/5 in the left knee for both flexion and extension. There was no anterior or posterior instability in the right and left knees. There was medial-lateral instability in the left and right knees: 2+ (5-10 mm). The examiner opined that the instability was moderate. There was no evidence of recurrent patellar subluxation or dislocation. There was no tibial and/or fibular impairment. The Veteran had a meniscus (semilunar cartilage) condition, namely a meniscal tear of both knees. He had frequent episodes of joint locking in both knees, frequent episodes of joint pain in both knees, and frequent episodes of joint effusion in both knees. He had a meniscectomy in each knee. He had no residual signs and/or symptoms due to the meniscectomy. 

With regard to scars, the Veteran had surgical scars on the knee, but none were painful and/or unstable, and the total area of all related scars was not greater than 39 square cm (6 square inches). Scars of the left knee were as follows: left lateral knee 1.0 by 0.3 cm, left above knee 1.2 by 0.7 cm, and left below knee 1.0 by 0.7 cm. The Veteran used a bilateral knee braces constantly for stability. The examiner opined that due to the Veteran's knee and/or lower leg conditions, there was not functional impairment of an extremity such that no effective function remains other than that which would be equally well served by an amputation with prosthesis. Arthritis was documented in both knees. There was no X-ray evidence of patellar subluxation. The Veteran's knee and/or lower leg conditions impacted his ability to work. Due to the Veteran's condition, he could lift 15 pounds, limited by the knees, and walk 1/4 mile with knee braces. Due to the Veteran's condition he could walk for one hour during an 8-hour day, could stand for 15 minutes and sit for 30 minutes at one time, and during an 8-hour day, he could stand for one hour and sit for four hours. The examiner stated that the Veteran could not climb stairs, run, kneel, squat or pass a DOT physical. The examiner stated that the left knee disability was best characterized as arthritis and meniscal tear with surgical repair and residual scar based on examination, history, and X-ray evidence. 

A December 2013 private medical record from Dr. M. reflects that the Veteran complained of bilateral knee pain. He said his knees popped a lot, and sometimes swelled, especially after being on his feet a lot. On examination of the bilateral knees, there was 0 degrees of extension and 120 degrees of flexion, a small effusion, and no instability with varus and valgus stress at 0 and 30 degrees of flexion. He did not have calf tenderness, and had a negative Homans sign. An X-ray study of the bilateral knees revealed Grade 4 degeneration, subchondral cysts, subchondral sclerosis, periarticular osteophytes, joint subluxation, and joint space narrowing. There was an estimated cartilage loss of 100 percent of the medial compartment, and an estimated cartilage loss of 75 percent of the lateral compartment. He had a varus knee. The diagnostic impression was osteoarthritis knee, bilateral knee pain. 

Rating Period Prior to July 2, 2010

Prior to July 2, 2010 (the date of left knee arthroscopy and partial medial meniscectomy), the RO rated the Veteran's service-connected left knee disability as 10 percent disabling, under Diagnostic Code 5010-5257.

During the rating period prior to July 2, 2010 (when the Veteran had his left knee arthroscopy and partial medial meniscectomy), the left knee disability has been rated as 10 percent disabling. After a review of all of the evidence of record, the clinical reports do not document that the Veteran's left knee disability was productive of functional impairment consistent with limitation of extension to 15 degrees or more or limitation of flexion to 30 degrees or less as required under Diagnostic Codes 5261 and 5260 for a rating in excess of 10 percent at any time during this portion of the appeal period. In fact, flexion of the left knee was to 95 degrees on March 2010 VA examination and to 90 degrees at a private examination by Dr. M. in June 2010, and extension was consistently full during this period. See 38 C.F.R. § 4.71, Plate II. Even considering the effects of pain on motion, there is no probative evidence that pain reduced motion during this period to the extent required for an increased rating in excess of 10 percent under the limitation of motion codes. 38 C.F.R. §§ 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202 (1995). In essence, the medical reports on file do not demonstrate the level of loss of motion (in either flexion or extension) necessary for either a higher rating or separate ratings based on limitation of flexion or extension at any time during this portion of the appeal period. The current 10 percent rating is proper for the left knee disability based on X-ray evidence of arthritis with painful motion. 38 C.F.R. §§ 4.59, 4.71a, Diagnostic Code 5010; Lichtenfels, supra; VAOPGCPREC 9-98. 

The Board will also consider whether an increased rating is warranted under other relevant Diagnostic Codes. During this period, considering the left knee disability under Diagnostic Code 5257, pertaining to instability, the Board finds that the evidence does not show moderate recurrent subluxation or lateral instability, and thus a higher 20 percent rating is not warranted under this Code. The evidence reflects that the Veteran denied instability on VA examination in March 2010, and the VA examiner found no instability on examination. In a June 2010 private examination, Dr. M. noted stable ligaments in the left knee.

During this period, the evidence reflects that the Veteran had a meniscal tear of the left knee. Considering the left knee disability under Diagnostic Code 5258, pertaining to a dislocated semilunar cartilage, the clinical evidence does not show that the Veteran had a dislocated semilunar cartilage. However, the evidence reflects that the Veteran had a meniscal tear as shown on MRI, he complained of locking, constant pain, and effusion into the left knee joint, and left knee effusion was objectively noted by some examiners. Hence, the Board finds that it is more favorable to rate the Veteran's left knee disability under Diagnostic Code 5258, based on frequent episodes of pain and effusion resulting in limitation of motion of the left knee, and a 20 percent rating is warranted under this Code instead of the 10 percent rating formerly assigned under Diagnostic Codes 5257 and 5010. Separate ratings are not warranted under both 5258 and a limitation of motion Diagnostic Code, as the clinical evidence reflects that the symptoms due to his residuals of meniscectomy included pain and effusion resulting in decreased mobility. Thus, the Board finds that in this case, separate ratings based on pain with limitation of motion under 5260 and 5258 would constitute impermissible pyramiding under 38 C.F.R. § 4.14, and thus a separate rating is not warranted under Diagnostic Codes 5258 and 5260.

A higher rating in excess of 20 percent is not warranted under any other applicable Diagnostic Code. Diagnostic Code 5259 is inapplicable during this period as he did not have symptomatic removal of a semilunar cartilage. Diagnostic Codes 5256, 5262, and 5263 are inapplicable during this period as he did not have ankylosis of the left knee, impairment of the tibia and fibula, or genu recurvatum.

In sum, an increased 20 percent rating is granted for the service-connected left knee disability throughout the rating period prior to July 2, 2010, under Diagnostic Code 5258.

Extension of a Convalescent Rating Beyond September 1, 2010

A temporary total rating will be assigned without regard to other provisions of the rating schedule when it is established by report at hospital discharge or outpatient release that entitlement is warranted, effective the date of hospital admission or outpatient treatment and continuing for a period of one, two, or three months from the first day of the month following such hospital discharge or outpatient release. Such total rating will be followed by appropriate schedular evaluations. Total ratings will be assigned under this section if treatment of a service-connected disability resulted in: (1) surgery necessitating at least one month of convalescence; (2) surgery with severe postoperative residuals such as incompletely healed surgical wounds, stumps of recent amputations, therapeutic immobilization of one major joint or more, application of a body cast, or the necessity for house confinement or the necessity for continued use of a wheelchair or crutches, regular weight-bearing being prohibited; or (3) immobilization by cast, without surgery, of one major joint or more. 38 C.F.R. § 4.30(a). Under 38 C.F.R. § 4.30 (b), a total rating of one, two, or three months beyond the initial three months may be extended under any of the three conditions above. Extensions of one or more months up to six months beyond the initial six months period may be made upon approval of the Adjudication Officer.

The Veteran had surgery on his left knee on July 2, 2010. The RO assigned a related temporary total (100 percent) convalescent rating for the period from July 2, 2010 to September 1, 2010. The Board notes that the Veteran also had right knee surgery in August 2010. The Veteran maintains that his convalescent rating should be extended because he was unable to work because both knees have the same problem. See his September 2014 notice of disagreement.

Private medical records reflect that in a July 2010 note, Dr. M. stated that the Veteran had surgery on July 2, 2010, and he recommended absence from work until August 16, 2010. 

A July 30, 2010 private medical record from Dr. M. reflects that the left knee was examined, and the Veteran was two weeks status post left knee arthroscopy and partial medial meniscectomy and doing well. On examination, the portal holes looked good. There were no signs of infection and no calf tenderness. Homan's was negative. He had full range of motion and there was no significant effusion. Dr. M. stated that the Veteran needed to continue to work on range of motion, and avoid squatting, deep knee bending and pivoting on the left knee. 

The Veteran underwent right knee surgery in August 2010, and subsequent private medical records reflect left knee full extension and flexion to 90 degrees, stable ligaments, crepitus, and arthritis. He continued to work on range of motion. Flexion was to 120 degrees in June 2011, per his private physician, and to 87 degrees on VA examination in June 2011. The VA examiner indicated that the Veteran was not at MMI with regard to his postoperative left knee.

The Board has reviewed all of the medical evidence of record and notes that a late July 2010 private medical record shows that the Veteran was standing and working on his range of motion, which was reportedly full. The Board observes that the Veteran was sufficiently recovered from his left knee arthroscopic partial meniscectomy to undergo right knee surgery on August 5, 2010. The Veteran has essentially argued that convalescence from his right knee surgery should also be considered. The Board finds that convalescence from the left knee operation was completed as of August 16, 2010, and that therefore an extension of the temporary total convalescent rating is not in order. 

The preponderance of the evidence is against the Veteran's claim for an extension of a temporary total convalescent rating beyond September 1, 2010 based on left knee surgery. Consequently, the benefit-of-the-doubt rule does not apply, and the claim must be denied. 38 U.S.C.A. § 5107 (b) (West 2014); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

Increased Rating for the Left Knee Disability During the Period from September 1, 2010 to January 5, 2015

The RO has assigned separate ratings from June 15, 2013 to January 6, 2015. A 10 percent rating was assigned for service-connected left knee degenerative changes with painful extension from September 1, 2010 to January 6, 2015 under Diagnostic Codes 5003-5261, a 20 percent rating for service-connected left knee instability under Diagnostic Code 5257, and a 20 percent rating for service-connected left knee painful flexion under Diagnostic Codes 5003-5260.

During the rating period from September 1, 2010 to June 15, 2013, after a review of all of the evidence of record, the clinical reports do not document that the Veteran's left knee disability was productive of functional impairment consistent with limitation of extension to 15 degrees or more or limitation of flexion to 30 degrees or less as required under Diagnostic Codes 5261 and 5260 for a rating in excess of 10 percent at any time during this portion of the appeal period. In fact, flexion of the left knee was to 90 degrees on private examinations in November 2010 and January 2011, to 120 degrees in June 2011, and to 120 degrees in February 2012. On VA examination June 2011, flexion was to 87 degrees, and on VA examination in July 2012 flexion was to 95 degrees. Extension was full throughout this period until July 2012, when it was noted to be limited to 10 degrees. Even considering the effects of pain on motion, there is no probative evidence that pain reduced motion during this period to the extent required for an increased rating in excess of 10 percent under the limitation of motion codes. 38 C.F.R. §§ 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202 (1995). In essence, the medical reports on file do not demonstrate the level of loss of motion (in either flexion or extension) necessary for either a higher rating or separate ratings based on limitation of flexion or extension at any time during this portion of the appeal period. The current 10 percent rating is proper for the left knee disability based on X-ray evidence of arthritis with painful motion. 38 C.F.R. §§ 4.59, 4.71a, Diagnostic Code 5010; Lichtenfels, supra; VAOPGCPREC 9-98. 

The Board will also consider whether an increased rating is warranted under other relevant Diagnostic Codes. During this period, considering the left knee disability under Diagnostic Code 5257, pertaining to instability, the Board finds that the evidence does not show moderate recurrent subluxation or lateral instability, and thus a higher 20 percent rating is not warranted under this Code. VA and private examiners found no instability of the left knee on multiple examinations between September 1, 2010 and August 22, 2011.

During the period from September 1, 2010 and August 22, 2011, the Board finds that the evidence reflects that the Veteran was status post partial meniscectomy, and some of the medical records show symptoms including pain, clicking and locking. Considering the left knee disability under Diagnostic Code 5258, pertaining to a dislocated semilunar cartilage, the clinical evidence does not show that the Veteran had a dislocated semilunar cartilage. Left knee effusion was objectively noted by some examiners. Hence, the Board finds that it is more favorable to rate the Veteran's left knee disability under Diagnostic Code 5258, based on frequent episodes of pain and effusion resulting in limitation of motion of the left knee, and a 20 percent rating is warranted under this Code instead of the 10 percent rating formerly assigned under Diagnostic Codes 5257 and 5003. Separate ratings are not warranted under both 5258 and a limitation of motion Diagnostic Code, as the clinical evidence reflects that the symptoms due to his residuals of meniscectomy included pain and effusion resulting in decreased mobility. Thus, the Board finds that in this case, separate ratings based on pain with limitation of motion under 5260 and 5258 would constitute impermissible pyramiding under 38 C.F.R. § 4.14, and thus a separate rating is not warranted under Diagnostic Codes 5258 and 5260.

A higher rating in excess of 20 percent is not warranted under any other applicable Diagnostic Code. Diagnostic Codes 5256, 5262, and 5263 are inapplicable during this period as he did not have ankylosis of the left knee, impairment of the tibia and fibula, or genu recurvatum. The maximum rating under Diagnostic Code 5259 is 10 percent, and this an increased rating is not warranted under this Code.

In sum, an increased 20 percent rating is granted for the service-connected left knee disability throughout the rating period from September 1, 2010 to August 22, 2011, under Diagnostic Code 5258.

The Board has considered the Veteran's lay assertions regarding the severity of his left knee disability. His statements are competent in regard to reports of symptoms and credible to the extent of the Veteran's sincere belief that his symptoms are more severe than the current rating. The Board has also considered the Veteran's use of a left knee brace during the period from August 22, 2011.

From August 22, 2011 to June 15, 2013, the Board finds that the left knee disability is more appropriately rated with a separate 10 percent rating for slight instability under Diagnostic Code 5257, a 10 percent rating for limitation of flexion under Diagnostic Codes 5010-5260, and a 10 percent rating for painful extension of the left knee under Diagnostic Codes 5010-5261. The medical evidence shows that the left knee disability was manifested by degenerative joint disease with pain, limitation of flexion, and slight instability. On August 22, 2011, the Veteran complained of instability, and Dr. M. prescribed an unloading brace for the left knee. A 10 percent rating is assigned for no more than slight instability. Dr. M. found no instability on examination, but nonetheless prescribed a brace based on the Veteran's lay complaints. There was no instability on VA examinations in June 2011 and July 2012, but there was effusion and tenderness. A February 2012 private medical record reflects that the Veteran was given a left knee medial unloading brace. 

From August 22, 2011 to June 15, 2013, a separate 10 percent rating is assigned for arthritis with pain and limitation of flexion, as flexion was limited to no less than 95 degrees during this period.

From August 22, 2011 to June 15, 2013, a separate 10 percent rating is assigned for arthritis with painful extension, as extension was painful and/or limited to no more than 10 degrees during this period.

During the period from June 15, 2013 to January 6, 2015, the Board finds that the currently assigned 20 percent rating for moderate instability is appropriate under Diagnostic Code 5257, in light of the examination findings on VA examination on June 15, 2013. There was no anterior or posterior instability in the left knee, and there was medial-lateral instability in the left knees that was 2+ (5-10 mm). The examiner opined that the instability was moderate. There was no evidence of recurrent patellar subluxation or dislocation. The Board finds that the evidence does not reflect severe recurrent subluxation or lateral instability during this period. An increased rating in excess of 20 percent rating for left knee instability is denied as the preponderance of the evidence weighs against this part of the claim.

During the period from June 15, 2013 to January 6, 2015, the Board finds that the currently assigned 10 percent rating for painful extension of the left knee is appropriate under Diagnostic Codes 5010-5261, in light of the examination findings on VA examination on June 15, 2013, which show that extension was limited to no more than 0 degrees, with objective evidence of painful motion.

During the period from June 15, 2013 to January 6, 2015, the Board finds that a higher 30 percent rating is warranted for painful flexion of the left knee under Diagnostic Codes 5010-5260, in light of the examination findings on VA examination on June 15, 2013. At this examination flexion was initially limited to no less than 65 degrees, with painful motion at 30 degrees, but there was no motion after repetitive motion testing. A separate rating is not warranted for frequent locking of the left knee, which was observed by the examiner at this examination, under Diagnostic Code 5259 because that would constitute pyramiding. 38 C.F.R. § 4.14.

Moreover, under the amputation rule, the combined rating for a disability shall not exceed the rating for amputation at the elective level of the extremity, were amputation to be performed. 38 C.F.R. § 4.68. Amputation of the thigh is rated 60 percent disabling. 38 C.F.R. § 4.71a, Diagnostic Code 5162-3.

A higher rating is not warranted under any applicable rating criteria throughout the rating period on appeal. Because there continued to be range of motion of this knee, even considering the arthritic pain, ankylosis of the left knee is not shown. Ankylosis is stiffening or fixation of the joint as the result of a disease process, with fibrous or bony union across the joint. See Dinsay v. Brown, 9 Vet. App. 79, 81 (1996), citing Dorland's Illustrated Medical Dictionary at 86 (27th ed. 1988) (Ankylosis is "immobility and consolidation of a joint due to disease, injury, or surgical procedure."). Thus, Diagnostic Code 5256 does not apply. There are no other relevant codes for consideration. 

The Board has considered whether extraschedular consideration is warranted. The discussion above reflects that the symptoms of the Veteran's left knee disability (mainly pain, instability, effusion and limitation of motion) are contemplated by the applicable rating criteria. Higher ratings are possible under other Diagnostic Codes, but the required symptoms for such ratings have not been shown. The effects of pain and functional impairment have been taken into account and are considered in applying the relevant criteria in the rating schedule. See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca, supra. The effects of the Veteran's left knee disability have been fully considered and are contemplated in the rating schedule; hence, referral for an extraschedular rating is unnecessary at this time. Consideration of whether the Veteran's disability picture exhibits other related factors such as those provided by the regulations as "governing norms" is not required and referral for an extraschedular rating is unnecessary. Thun v. Peake, 22 Vet. App. 111 (2008).


ORDER

New and material evidence has been received, and the petition to reopen the claim for service connection for a right knee/leg disability is reopened; to this extent only, the appeal is granted.

New and material evidence has been received, and the petition to reopen the claim for service connection for a left shoulder/arm disability is reopened; to this extent only, the appeal is granted.

A 20 percent disability rating, but no higher, for postoperative bilateral heel spurs with plantar fasciitis is granted throughout the rating period on appeal, subject to the legal authority governing the payment of compensation.

During the period prior to July 2, 2010, a 20 percent disability rating, but no higher, for the service-connected left knee disability is granted, subject to the legal authority governing the payment of compensation.

An extension of a temporary total disability convalescent rating, beyond September 1, 2010, based on left knee surgery, is denied.

During the period from September 1, 2010 to August 22, 2011, a 20 percent disability rating, but no higher, for the service-connected left knee disability is granted, subject to the legal authority governing the payment of compensation.

During the rating period from August 22, 2011 to June 15, 2013, three separate 10 percent ratings, but no higher, for slight instability, painful flexion, and painful extension of the left knee are granted, subject to the legal authority governing the payment of compensation. 

During the period from June 15, 2013 to January 6, 2015, a rating in excess of 20 percent for instability of the left knee is denied.

During the period from June 15, 2013 to January 6, 2015, a 30 percent rating, but no higher, for painful flexion of the left knee is granted, subject to the legal authority governing the payment of compensation.

During the period from June 15, 2013 to January 6, 2015, a rating in excess of 10 percent for painful extension of the left knee is denied. 


REMAND

Regarding the claim for increased rating for a left knee TKR since January 6, 2015, the AOJ has rated the left TKR as 100 percent disabling from January 6, 2015, with a 30 percent rating for the disability since March 1, 2016.

The Veteran has not undergone a VA examination of the left knee disability since the January 2015 left TKR. The Board finds that a VA examination of the left knee is needed, that considers the holding in Correia v. McDonald, 28 Vet. App. 158 (2016), which held that the final sentence of 38 C.F.R. § 4.59 requires that VA examinations include joint testing for pain on both active and passive motion, in weight-bearing and nonweight-bearing and, if possible, with range of motion measurements of the opposite undamaged joint, is needed in this case.

A VA examination is also needed to determine if the current right knee disability and left shoulder disability are related to service or a service-connected disability. See Waters v. Shinseki, 601 F.3d 1274 (Fed. Cir. 2010). The examiner is asked to review the March 2010 VA examination in which the examiner suggested that the Veteran's bilateral knee disability may be related to parachute use in service, based on the Veteran's reports.

Updated VA and private treatment records should also be obtained. The claims file suggests that the Veteran may receive treatment at an Army Community Hospital. 38 U.S.C.A. § 5103A(c) (West 2014); see also Bell v. Derwinski, 2 Vet. App. 611 (1992) (VA medical records are in constructive possession of the agency, and must be obtained if the material could be determinative of the claim).

Finally, the AOJ should adjudicate the TDIU claim, after providing the Veteran with appropriate notice and development.

Accordingly, the case is REMANDED for the following action:

1. Obtain updated relevant VA medical records pertaining to treatment or evaluation of a left knee disability, right knee/leg disability and a left shoulder/arm disability.

2. With any necessary releases, obtain any relevant private or military medical records pertaining to treatment or evaluation of a left knee disability dated since January 2014, and regarding a right knee/leg disability and a left shoulder/arm disability dated since separation from service, that are not already on file.

3. Provide the Veteran with appropriate notice regarding the TDIU claim, and a VA Form 21-8940, and ask him to fill the form out completely. 

4. Obtain employment information from any employers identified by the Veteran.
 
5. Schedule the Veteran for a VA orthopedic examination. The claims file should be made available to and reviewed by the examiner. All indicated tests and studies should be performed and all clinical findings reported in detail. A thorough history should be obtained from the Veteran. 

(a) The examiner should provide an opinion as to whether it is at least as likely as not (i.e., probability of 50 percent or greater) that any diagnosed right knee/leg disability had its onset during active service or is otherwise related to any incident of service. The examiner should explain why or why not. Please review the report of the March 2010 VA examination.

(b) The examiner should provide an opinion as to whether it is at least as likely as not (i.e., probability of 50 percent or greater) that any diagnosed left shoulder/arm disability had its onset during active service or is otherwise related to any incident of service. The examiner should explain why or why not. 

(c) If not related to service, is it at least as likely as not that the Veteran's service-connected left knee disability or bilateral foot disability caused any currently diagnosed right knee/leg disability? The examiner should explain why or why not.

(d) If not caused by the service-connected left knee disability, is at least as likely as not that any diagnosed right knee/leg disability was permanently worsened beyond its natural progression by the Veteran's service-connected status left knee disability? If so, the examiner should attempt to quantify the degree of worsening beyond the baseline level of right knee disability. A rationale for the opinions expressed should be provided.

(e) Determine the current severity of the left TKR. All appropriate tests and studies should be conducted and the results reported in detail. Range of motion testing should be undertaken for both knees. The examiner is to report the range of motion measurements in degrees for both ankles to permit comparison. Range of motion should be tested actively and passively, in weight bearing and non-weight bearing, and after repetitive use. The examiner should consider whether there is likely to be additional range of motion loss due to any of the following: (1) during flare-ups; and, (2) as a result of pain, weakness, fatigability, or incoordination. If so, the examiner is asked to describe the additional loss, in degrees, if possible. 

If the examiner is unable to conduct the required testing or concludes that the required testing is not necessary in this case, he or she should clearly explain why that is so.

6. After completing the requested action, and any additional action deemed warranted, the AOJ should readjudicate the remaining claims on appeal, and adjudicate the TDIU claim. If the benefits sought on appeal are denied, the Veteran and his representative should be furnished a supplemental statement of the case and given the opportunity to respond thereto. The case should then be returned to the Board for further appellate consideration, if in order.

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).







 (Continued on the next page)

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




S. L. Kennedy 
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs